[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 13, 2004
THOMAS K. KAHN
CLERK

No. 03-13765

D. C. Docket No. 01-00894 CV-D-N

DONYA LEIGH ANDERSON,

Plaintiff-Appellant,

versus

UNUM PROVIDENT CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(May 13, 2004)**

Before MARCUS and WILSON, Circuit Judges, and LIMBAUGH[*], District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

The Plaintiff Donya Leigh Anderson appeals from the district court's order granting final summary judgment to the defendant, UNUM Provident Corporation ("UNUM") in this diversity action for breach of contract, fraud, suppression, and bad faith because UNUM denied Anderson's claim for long term disability benefits. The district court held that UNUM's long term disability plan was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, and, therefore, that Anderson's state law claims were wholly preempted by ERISA. After thorough review of the record and careful consideration of the parties' briefs and oral presentations we agree and, accordingly, affirm.

## I.

The relevant facts and procedural history are straightforward. Since 1990 until at least the filing of her lawsuit against UNUM on June 18, 2001, Anderson was employed by Shaw Industries, Inc. ("Shaw"). In 1997, Shaw first contracted with UNUM to provide a long term disability plan (the "UNUM Plan") to its hourly employees. In March 2000, Shaw renewed this contract with UNUM. Shaw, the largest carpet manufacturer in the world, conducts its business nationwide and the UNUM Plan is available to its hourly employees throughout the nation. Anderson participated in the UNUM Plan at all relevant times.

2

Upon commencing employment at Shaw, every employee receives the "Employee Information and Benefits Portfolio" (the "Benefits Portfolio"), which identifies all employee benefits provided by Shaw, including the "Optional Long Term Disability Plan." The cover of the Benefits Portfolio features a corporate logo (the "Shaw Emblem") which features the words "Shaw Industries, Inc. Benefits & You" and a caption below stating "Corporate Employee Benefits Department." The Benefits Portfolio does not refer to UNUM by name, but the UNUM Plan is the sole long term disability plan offered by Shaw.

As the Benefits Portfolio explains, only hourly employees who have worked for at least 90 days are eligible to purchase the UNUM Plan. During the 90-day waiting period, employees are covered by the Short Term Disability Plan, which Shaw provides at no cost to its employees. The Benefits Portfolio includes a comprehensive description of this Short Term Disability Plan, which explains in part that no benefits shall be payable under this plan if the disability entitles the participant to any benefits "under the Shaw Optional Long Term Disability Plan."

Every year, Shaw sends letters to its employees and posts notices in the workplace reminding the employees of the open enrollment period for its benefit plans, notably including the UNUM Plan. If employees do not enroll in the UNUM Plan when they first become eligible, they must wait until the next open

enrollment period. To enroll, employees complete a form that bears the Shaw Emblem and is titled "Optional Long Term Disability Plan." There is no UNUM corporate logo on the form, but a sentence in the middle of the page, in regular font, informs the applicant that "[t]his is an insured Plan by 'Unum/Provident.'" The form notes that the 90-day eligibility period is the "period covered by Shaw Short Term Disability." By signing the document, the employee instructs Shaw to deduct the insurance premiums from the employee's payroll. Employees file the form at the human resources office of the Shaw facility where they work, and the form is then forwarded to the Shaw corporate office.

Payroll deduction is the only method available to pay the UNUM Plan premiums. After an employee enrolls, Shaw enters the payroll deduction into its payroll system and sends a monthly remittance to UNUM of all premiums withheld from the employees' paychecks, along with a total number of employees enrolled. Employees pay premiums to the UNUM Plan according to their age bracket and Shaw monitors increases in premium amounts as employees reach certain ages. When the UNUM Plan first was used by Shaw employees, employees paid a flat rate, but in 2000, on UNUM's recommendation, Shaw made the decision to use an age-graded rate. Shaw does not decide claims or review denials of claims, but the Shaw Emblem is found at the top of the claim forms and

4

Shaw's human resources offices maintain supplies of the claim forms. Moreover, when an employee files a claim, Shaw must fill out the employer portion of the claim form and, because enrollment forms are not forwarded to UNUM and UNUM does not maintain a list of all enrolled employees, Shaw must confirm the employee's coverage. Shaw then is responsible for submitting the completed claim form to UNUM. Indeed, Shaw employees direct any questions about the UNUM Plan to the human resources office at the Shaw facility where they work. The human resources staff explains the available benefits and answers any questions about the UNUM Plan.

Moreover, all Shaw hourly employees who enroll in the UNUM Plan are provided with an information booklet describing the nature of the long term disability plan. The cover sheet of the booklet (the "UNUM Plan Booklet") is emblazoned with the Shaw Emblem and the title, "Hourly Long Term Disability Plan." The UNUM Plan Booklet is created by UNUM, but before distribution to employees, the Benefits Manager at Shaw's corporate headquarters in Dalton, Georgia, Anita Thornton, reviews a draft to ensure its features are understandable to Shaw employees.

At the time Anderson enrolled in the UNUM Plan, the UNUM Plan Booklet included a four-page section entitled "ERISA Summary Plan Description" (the

"SPD"). This SPD names Shaw as the plan administrator and gives its address and telephone as the plan administrator's contact information. The SPD also identifies Shaw as the agent for legal service of process on the plan. Furthermore, the SPD explains that the insured was "entitled to certain rights and protections under Employee Retirement Income Security Act of 1974 (ERISA)" and outlines those rights.

The Summary Plan Description also delineates Shaw's rights and responsibilities under the plan. It observes: (1) Shaw may request changes to the policy in whole or in part, and, subject to UNUM's approval, the change may be made so long as it is in writing and endorsed on or attached to the ERISA plan; and (2) Shaw may cancel the policy or a plan under the policy by written notice to UNUM at least 31 days prior to the cancellation date. According to the SPD, UNUM can cancel the policy or a plan under the policy if: (1) there is less than 25% participation of eligible employees; (2) Shaw fails to provide reasonably required information, including employee eligibility and coverage information; (3) fewer than 10 employees are insured under the plan; (4) the premium is not paid in accordance with the policy provisions; (5) Shaw does not promptly report to UNUM the names of the employees who are added or deleted from the group; (6) Shaw fails to pay any portion of the premium within the 45-day grace period; or

(7) Shaw otherwise fails to perform any of its obligations related to the policy. If UNUM modifies the policy in a way that was unacceptable to Shaw, Shaw can cancel the policy.

The actual policy between Shaw and UNUM, which Shaw does not provide to employees, contains the same basic information as the UNUM Plan Booklet and attaches the same SPD outlining Shaw and UNUM's rights and responsibilities. The cover sheet to the actual policy also states: "The policyholder should read this policy carefully and contact UNUM promptly with any questions. This policy is delivered in and is governed . . . to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments." The certificate of coverage restates this provision in precisely the same terms. Despite this specific language, Shaw's official position is that ERISA does not apply to the UNUM Plan. Some time after Anderson initiated this litigation, and in response to an employee's inquiry about ERISA rights under the plan, Shaw asked UNUM to remove the ERISA language from the documents[1].

---

[1] The exact timing of this request is unclear. In her September 6, 2001 deposition, the Shaw Benefits Manager, Anita Thornton, said that she asked Kristin Baker, a UNUM representative, to remove the ERISA language from the UNUM Plan Booklet. Thornton could not provide an exact date on which she made this request, but said it was within the "last year." Even if the communication occurred a full year before the deposition, it would have occurred after UNUM's initial denial of benefits on June 23, 2000 and after Anderson's initial submission of her claim to the Alabama state court.

In March 2000, Anderson became pregnant. Previously she had been diagnosed with cervical dysplasia, which required the removal of a portion of her cervix. The surgery left her at risk for complications during pregnancy. On June 5, 2000, Anderson submitted a claim to UNUM, contending that her physical condition during pregnancy qualified her for long term disability benefits. On June 23, 2000, UNUM denied Anderson's request for disability benefits. It determined that she was not "disabled" according to the terms of the policy. Anderson repeatedly asked UNUM for reconsideration and submitted additional information in support of her claim, but UNUM refused to change its decision to deny her long term disability benefits.

On June 19, 2001, Anderson filed this case in the Circuit Court of Crenshaw County, Alabama, asserting claims against UNUM for breach of contract, fraud, suppression, and bad faith because UNUM had denied her long term disability benefits. Soon thereafter, UNUM removed the case to the Middle District of Alabama based both on diversity and federal question jurisdiction. 28 U.S.C. §1441(a), (b). In August 2001, UNUM moved to dismiss and strike Anderson's state law claims and her demand for a jury trial on the grounds that her state law claims were completely pre-empted by ERISA. The district court converted UNUM's Motion to Dismiss into a Motion for Summary Judgment and, after

8

further discovery and briefing by the parties, entered a lengthy order on November 7, 2002, granting summary judgment to UNUM.

The district court determined that Shaw's activities did not fit into the safe harbor exclusion of certain insurance policies from ERISA's jurisdiction. The Department of Labor's safe harbor regulation, 29 C.F.R. § 2510.3-1(j), exempts certain plans from ERISA regulation. However, to qualify for the safe harbor, an insurance program may not, in part, be endorsed by the employer, whose sole function must only be "to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer." 29 C.F.R. § 2510.3-1(j)(3). The district court concluded that Shaw's actions rose to the level of endorsement, because Shaw singled out the UNUM Plan as the sole plan it offers to its hourly employees, played a role in selecting the premium rates, restricted employee eligibility, displayed its corporate logo on the policy documents which it provided to Shaw's employees, was named in the policy documents as the plan administrator, and provided a summary plan description to its employees that specifically referred to ERISA. Anderson v. UNUM/Provident Corp., Civ. No. 01-D-894-N at 8 (M.D. Ala. November 7, 2002) (order granting motion to dismiss and motion to strike).

9

The district court also found that the UNUM Plan otherwise qualified as an employee welfare benefit plan subject to ERISA.

On March 21, 2003, Anderson moved for reconsideration. After reviewing additional pleadings on the issue of whether the UNUM Plan was established or maintained by Shaw, the district court denied the motion. Again, it concluded that "the facts which take the policy out of the safe harbor protection also necessitate a finding that Shaw established the policy." Anderson, Civ. No. 01-D-894-N at 6 (M.D. Ala. July 17, 2003) (order denying motion for reconsideration). On July 17, 2003, the district court entered final judgment. This appeal followed.

## II.

We review the district court's grant of summary judgment de novo. Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296 (11th Cir. 2000). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, "we must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party."

Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997).

On appeal, Anderson argues that the district court erred by holding that the UNUM Plan was a long term disability plan "established or maintained" by an employer and hence was governed by ERISA. Because we find that Shaw clearly established and maintained an employee welfare benefits plan, we affirm.

ERISA governs "employee welfare benefit plan[s]," which the statute defines in the following broad terms:

> any plan, fund, or program which was . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) . . . benefits in the event of . . . disability.

29 U.S.C. § 1002(1) (emphasis added). "By definition, then, a welfare plan requires (1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing . . . benefits . . . (5) to participants or their beneficiaries." Donovan v. Dillingham, 688 F.2d 1367, 1371 (11th Cir. 1982) (internal quotation marks omitted). The central question in this case then is whether the third requirement

11

has been satisfied[2].  The parties do not dispute that the UNUM Plan was established in order to provide disability benefits to Shaw's employees and that the UNUM Plan otherwise meets the threshold requirements to be an ERISA plan.  However, ERISA does not apply unless the employer itself established or maintained the plan.  Id. (holding that ERISA applies only if "an employer or employee organization is the person that establishes or maintains the plan, fund, or program").

Our inquiry thus necessarily focuses on "the employer . . . and [its] involvement with the administration of the plan," Hansen v. Continental Ins. Co., 940 F.2d 971, 978 (5th Cir. 1991) (alteration in original) (internal quotation marks and citations omitted), not the conduct of any other ERISA entity.  Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1214-15 (11th Cir. 1999).  "[T]he 'established or maintained' requirement is designed to ensure that the plan is part

---

[2] To determine whether ERISA applies to a particular plan, courts usually begin by examining whether the plan falls into the regulatory safe harbor, which excludes from ERISA's jurisdictional ambit certain group or group-type insurance programs offered by an insurer to employees or members of an employee organization.  See Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1213-14 (11th Cir. 1999); 29 CFR § 2510.3-1(j).  However, in this case, the district court found, and Anderson does not dispute, that the UNUM Plan does not fall into ERISA's safe harbor regulation. As we have explained already, the district court ruled that, although the UNUM Plan satisfied three of the four criteria, the safe harbor did not apply because Shaw had endorsed the plans through its actions.  However, a plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA.  Butero, 174 F.3d at 1214 (holding that the fact that the safe harbor regulation does not apply does not necessarily mean the insurance policy is an ERISA plan).  Therefore, we still must engage in the conventional analysis of whether the plan was "established" or "maintained" by the employer.

of an employment relationship. . . . [W]e determine whether the plan is part of an employment relationship by looking at the degree of participation by the employer in the establishment or maintenance of the plan." Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 464 (10th Cir. 1997) (internal citation and quotation marks omitted).

Moreover, our determination of whether ERISA governs the UNUM Plan does not turn on whether Shaw intended the plan to be governed by ERISA, but rather on whether Shaw intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship. If the UNUM Plan satisfies the statutory definition of an employee welfare benefit plan, then ERISA applies regardless of the intent of the plan administrators and fiduciaries. Meredith v. Time Ins. Co., 980 F.2d 352, 354 (5th Cir. 1993) ("We are not here concerned with whether the entity that established and maintained the [plan] intended ERISA to govern the MEWA. For our guide we note that ERISA protection and coverage turns on whether the plan satisfies the statutory definition." (internal quotation marks omitted) (alteration in original)); Peckham v. Gem State Mut. of Utah, 964 F.2d 1043, 1049 n.11 (10th Cir. 1992) ("If a plan meets the five criteria outlined in Donovan it is governed by ERISA whether or not the parties wish to be subject to ERISA."); see also Donovan, 688 F.2d at 1372-74.

13

Our starting point for interpreting the statutory definition of an employee welfare benefit plan is "the language of the statute itself." Consolidated Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, 118 F.3d 1461, 1463 (11th Cir. 1997) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108, 100 S. Ct. 2051, 2056, 64 L. Ed. 2d 766 (1980)). "[W]e read the statute using the normal meanings of its words. Courts must assume that Congress intended the ordinary meaning of the words it used . . . ." Id. (internal quotation marks and citations omitted). Moreover, "absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." Id. (internal quotation marks and citations omitted). Under 29 U.S.C. § 1002(1), Shaw may invoke ERISA jurisdiction by either "establishing" or "maintaining" an employee welfare benefits plan, so we must define each term separately. Of course, the two definitions overlap, so several of Shaw's actions may fall into both categories.

"[T]o determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." United States v. McNab, 331 F.3d 1228, 1237 (11th Cir. 2003) (alteration in original) (internal citation and quotation marks omitted). The ordinary meaning of the word "establish" is to "settle, make, or fix firmly" or simply to "make or form." See, e.g., Webster's Third New International Dictionary 813 (1961) (defining "establish" as "1a: to

14

make firm or stable" or "4a: to bring into existence, create, make, start, originate, found, or build"); Black's Law Dictionary (7th ed. 1999) (defining "establish" as "1. to settle, make, or fix firmly" or "2. to make or form; to bring about or into existence."). In the context of an employee welfare benefits plan, we have said that "[a] plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit." Butero, 174 F.3d at 1214. "[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program . . . ." Donovan, 688 F. 2d at 1373. Rather, we examine all the surrounding facts and circumstances. Id. In Donovan, we described in the following terms the acts that are relevant to determining whether an employer has established an ERISA plan:

> Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality -- e.g., financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists -- but it is the reality of a plan . . . and not the decision to extend certain benefits that is determinative.

Donovan, 688 F.2d at 1373.

Because the term "establish" suggests making the UNUM Plan stable and firm, in order to establish the plan, Shaw would not only have to set up the UNUM Plan, but have an "expressed intention . . . to provide benefits on a regular and long

15

term basis." Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077, 1083 (1st Cir. 1990). For example, courts have paid particular attention to written agreements in which the employers must either provide benefits or "purchase benefits for a substantial percentage of a class of employees or members under circumstances tending to show an anticipated continuing furnishing of such benefits . . . ." Donovan, 688 F.2d at 1374-75; see also Wickman, 908 F.2d at 1083.

Moreover, even if Shaw did not originally establish the plan, ERISA would still apply if Shaw subsequently maintained the UNUM Plan. 29 U.S.C. § 1002(1). To "maintain" a plan, in the ordinary meaning of the word, simply means to "continue" a plan. See Webster's Third New International Dictionary 813 (1961) (defining "maintain" as "1: to keep in a state of repair, efficiency, or validity" or "4: to provide for: bear the expense of"); Black's Law Dictionary (7th ed. 1999) (defining "maintain" as "1. to continue"). Thus, for example, if Shaw began to involve itself more in the payment of benefits, changed the critical terms of the policy, or performed all the administrative functions associated with the maintenance of the plan, those would be actions on the part of the employer which could "maintain," rather than establish the plan as an employee welfare benefits plan. See Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 538 (7th Cir. 2000)

16

(finding no clear error in district court's finding that employer maintained its benefit plan for its employees).

In Butero, we suggested seven factors that may be relevant in determining whether an employee welfare benefits plan has been established. These factors are equally important in determining whether an employer maintained the plan: "(1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent." Butero, 174 F.3d at 1215 (citing Kenney v. Roland Parson Contracting Corp., 28 F.3d 1254, 1258 (D.C. Cir. 1994)). In this case, almost all of the Butero factors provide powerful reasons to conclude as a matter of law that Shaw both established and maintained an employee welfare benefit plan governed by ERISA.

Initially, Shaw made or formed the UNUM Plan and provided the necessary administrative support to firmly fix its existence. Rather than simply making a "decision to extend certain benefits," Shaw affirmatively made the plan a "reality," arranging to finance the benefits, establishing a procedure for disbursing benefits, and assuring its employees of the existence of the UNUM Plan. See Donovan, 688

17

F.2d at 1373. Numerous acts recorded, exemplified, and implemented its decision. See id.

First, Shaw established a fund to pay benefits. See Butero, 174 F.3d at 1215. It selected the UNUM Plan as the sole long term disability plan offered by Shaw and limited eligibility to hourly employees who had completed a three-month waiting period, making the UNUM Plan a benefit closely tied to the employer-employee relationship. See Searles v. First Fortis Life Ins. Co., 98 F. Supp. 2d 456, 460 (S.D.N.Y. 2000) (finding an ERISA plan was established by the employer where, among other actions taken, the employer chose the eligibility requirements for participation, including a 90-day qualifying period). Shaw thus brought the UNUM Plan into existence by choosing the insurance provider and deciding eligibility.

Second, while Shaw does not actually pay benefits, it is directly involved in the payment process. Butero, 174 F.3d at 1215. It maintains a supply of claim forms in its offices and requires employees to file claims through Shaw. Shaw fills out an employer section of the claim form, verifies employee eligibility, and sends the form to UNUM. By facilitating the payment of benefits, Shaw ensured that the UNUM Plan was fixed in a more stable form and that its employees actually received the intended benefits.

Finally, Shaw's representations in its internally distributed documents suggested that Shaw itself established the UNUM Plan. See Butero, 174 F.3d at 1215. The Shaw Emblem appears on all of the documents related to the UNUM Plan, including the Benefits Portfolio, the UNUM Plan Booklet, the enrollment form, and the claim form. Shaw includes the UNUM Plan in a comprehensive list of its employee benefits and refers to the UNUM Plan as the "Shaw Optional Long Term Disability Plan." See Hansen, 940 F.2d at 978 (considering employer's name and corporate logo on benefits booklet as evidence that employer established and maintained the plan); see also Johnson v. Watts Regulator Co., 63 F.3d 1129, 1137 (1st Cir. 1995) (distinguishing the booklet in Hansen, which described the policy as the company's plan and where the company's logo was embossed on the booklet itself, from the documents in Johnson which specifically described the plan as offered by another organization and only used the logo on a cover letter attached to the information booklet). The policy itself expresses Shaw's intent to "provide benefits on a regular and long term basis." Wickman, 908 F.2d at 1083. Indeed, according to the policy, Shaw has certain, ongoing obligations under the plan and the continued viability of the plan depends upon minimum participation by Shaw employees as a whole.

Furthermore, at the time that this controversy arose, both the UNUM Plan Booklet and the actual policy between Shaw and UNUM named ERISA as providing the governing law. Gaylor, 112 F.3d at 464-465 ("In addition, [the employer] distributed to its employees a handbook detailing ERISA rights, which is "strong evidence that the employer has adopted an ERISA regulated plan.") (internal citation and quotation marks omitted); Wickman, 908 F.2d at 1083. The UNUM Plan Booklet, distributed by UNUM and approved by the Shaw Benefits Manager, contains a four-page section entitled "ERISA Summary Plan Description" which informs plan participants of their rights under ERISA. The same SPD, which was also attached to the actual policy, expressly identifies Shaw as the plan administrator and provided Shaw's address and telephone number as the plan administrator's contact information. In addition, the actual policy's cover sheet and the certificate of coverage both clearly state that ERISA governed the policy.

Because of these representations, the reasonable understanding of the employees and Shaw's failure to correct known perceptions of the plan indicate that Shaw had established an employee welfare benefit plan and intended to fulfill its continuing obligations under the plan. See Butero, 174 F.3d at 1215; Wickman, 908 F.2d at 1083. The documents provided to employees by Shaw not only suggest

20

that the UNUM Plan was established by Shaw, but explicitly state that the UNUM Plan was governed by ERISA. Shaw failed to correct employees' known perceptions of the existence of an ERISA plan before the beginning of this litigation. Although Shaw's official position is that ERISA does not apply to the UNUM Plan, and it did inform at least one employee that ERISA did not apply, there is no evidence that Shaw did anything to change the ERISA language in any of these documents until after Anderson filed her initial claim. Indeed, the Benefits Manager had the opportunity to modify this language when she reviewed the UNUM Plan Booklet, but did not do so. Thus, on the whole, Shaw's actions and representations both formed and fixed firmly into existence the UNUM Plan, which is enough to warrant governance by ERISA.

However, Shaw also took an active and continuing role in maintaining the plan. Again, most of the Butero factors support the conclusion that Shaw maintained the plan. Shaw's representations in internally distributed documents, its maintenance of a fund to pay benefits, its involvement in the actual payment of benefits, its deliberate failure to correct known perceptions about the UNUM Plan, the reasonable understanding of employees, and its expressed intent all support the conclusion that Shaw had taken steps to continue the UNUM Plan long after its initial establishment. Three years after the initial establishment of the UNUM Plan,

Shaw renewed its obligations under the policy, thereby maintaining the fund to pay benefits. In doing so, it also exercised its power to modify the terms of the plan by changing the rate of premiums from a flat rate to an "age-graded" rate. At least until this litigation began, Shaw continued to use documents that bore the Shaw Emblem and discussed ERISA rights, without attempting to change the language.

Under the policy, Shaw serves as the agent for legal service of process and as the plan administrator. And in keeping with its plan administrator role, Shaw continues to perform administrative functions to ensure that employees would receive benefits. It informs every incoming employee about the "Shaw Optional Long Term Disability Plan," reminds employees to sign up for all benefits during open enrollment periods, provides enrollment forms with its logo on it, and files the enrollment forms in its corporate office. Employees contact Shaw's human resource offices with any questions about the plan and explanations of their benefits. Shaw is also responsible for payroll deductions, remitting premiums to UNUM, and verifying coverage under the UNUM Plan before UNUM decided claims. Indeed, payroll deduction is the employees' sole means of purchasing the insurance and Shaw is required under the policy to remit the premiums to UNUM by the first day of each month. See Kidder v. H&B Marine, Inc., 932 F.2d 347, 353 (5th Cir. 1991) (finding that the plan was governed by ERISA partly because the

22

employer was "'solely responsible'" for submitting monthly premiums directly to insurance company) (citing <u>Memorial Hosp. Sys. v. Northbrook Life Ins. Co.</u>, 904 F.2d 236, 242-43 (5th Cir. 1990). Finally, Shaw provides a supplemental "Shaw Short Term Disability Plan" at no cost to the employees, which works in concert with the UNUM Plan to provide comprehensive disability benefits to Shaw employees.

We therefore hold that the UNUM Plan was both established and maintained by Shaw and is governed by ERISA. In <u>Butero</u>, we found that many of the same actions as those performed by Shaw took "the implementation of its plan sufficiently beyond that in cases where no establishment occurred." 174 F.3d at 1214. Like Shaw, the employer in <u>Butero</u> "consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks to [the insurance company]." <u>Id.</u> As a result, in <u>Butero</u>, we held that the employer had established or maintained an employee welfare benefit plan. <u>Id.</u> at 1215. We can discern no reason to depart from this precedent.

Indeed, many of the general policies behind the enactment of ERISA support the conclusion that Shaw's actions warrant application of ERISA and the pre-

23

emption of Anderson's state law claims. When it created ERISA, Congress considered the interests of employees, by mandating disclosure requirements, fiduciary standards, appropriate remedies and sanctions, and ready access to federal courts, but also considered the interest in giving employers the administrative flexibility necessary to continue the growth of employee welfare benefit plans. See 29 U.S.C. §§ 1001(b) (describing purpose of plan in terms of employee interests); H.R. Rep. No. 93-533 (1973), pt. I, at 4639, pt. V, at 4647, reprinted in 1974 U.S.C.C.A.N. 4639, 4639, 4647 ("The Committee believes that the legislative approach of establishing minimum standards and safeguards for private pensions is not only consistent with retention of the freedom of decision-making vital to pension plans, but in furtherance of the growth and development of the private pension system."). Because Shaw was so active in constructing and controlling the terms and administration of the UNUM Plan, it is more likely both to create -- and disappoint -- the kind of employee expectations that ERISA is intended to protect.

Moreover, once rights and responsibilities under ERISA are invoked, overlapping state law claims are necessarily preempted since they may conflict with ERISA's elaborate system of employee protections. See 29 U.S.C. §1144(a) (supersedure of state causes of action). Indeed, the Supreme Court has noted that ERISA's pre-emption provisions protect employers from "conflicting or

inconsistent State and local regulation of employee benefit plans." Fort Halifax

Packing Co., Inc. v. Coyne, 482 U.S. 1, 9, 107 S. Ct. 2211, 2216, 96 L. Ed. 2d 1

(1987) (internal citation and quotation marks omitted). The Court has repeatedly

noted that "[o]bligating the employer to satisfy the varied and perhaps conflicting

requirements of particular state fair employment laws . . . would make

administration of a nationwide plan more difficult" and produce "considerable

inefficiencies." Id. at 10, 107 S. Ct. at 2217 (quoting Shaw v. Delta Airlines, Inc.,

463 U.S. 85, 105, 105 n.5, 96-97, 103 S. Ct. 2890, 2904, 2904 n.25, 77 L. Ed. 2d

490 (1983)). "ERISA's comprehensive pre-emption of state law was meant to

minimize this sort of interference with the administration of employee benefit

plans, so that employers would not have to administer their plans differently in

each State in which they have employees." Id. (internal citations and quotation

marks omitted). Pre-emption thus removes one obstacle from Shaw's ability to

establish or maintain an often complicated, nationwide insurance plan and pass the

benefits of a coordinated group system on to its employees.

In short, when an employer establishes or maintains an employee welfare

benefits plan -- as Shaw plainly did in this case -- the application of ERISA and the

pre-emption of state law is necessary both to protect employees' interests and to

provide a uniform set of regulations to govern the plan. Accordingly, we AFFIRM

the district court's grant of summary judgment.

AFFIRMED.