[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-15383
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 18, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-02075-CV-BBM-1

ROSS GLENN MOORMAN, JR.,

Plaintiff-Appellant,

versus

UNUMPROVIDENT CORPORATION,
a Delaware Corporation, in its individual capacity
and as controlling parent of its wholly owned
subsidiary, Unum Life Insurance Company of
America, a Maine Corporation,

UNUM LIFE INSURANCE COMPANY OF AMERICA,
a Maine Corporation, in its individual capacity
and as a wholly owned and controlled subsidiary
of UnumProvident Corporation,

UNUM CORPORATION,
a Maine Corporation merged to form UnumProvident
Corporation, in its individual capacity and as
controlling parent company of its wholly owned
subsidiary, Unum Life Insurance Company of
America, a Maine Corporation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(September 18, 2006)**

Before EDMONDSON, Chief Judge, BIRCH and ALARCON,[*] Circuit Judges.

BIRCH, Circuit Judge:

The central issue in this interlocutory appeal is the proper reach of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Ross Glenn Moorman, Jr., argues that the district court erred in ruling that ERISA governed the disability insurance plan provided by UnumProvident Corporation, Unum Life Insurance Company of America ("Unum Life"), and Unum Corporation (collectively "Appellees"). After careful review of the facts in this case, the relevant case law, and the underlying purposes of ERISA, we AFFIRM the district court's ruling that ERISA governs the plan in this case. As an additional matter, Appellees ask us to review Moorman's claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961 et seq. We decline to review Moorman's RICO claims, which were not certified for appeal by the district court, because the district court has not had an adequate

_____

[*]Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

opportunity to address the defenses raised on appeal by the Appellees.

## I. BACKGROUND

Quoting liberally and making additions as necessary, we largely adopt the district court's statement of the facts in this case: In a letter dated 17 October 1996, Brian Glenn, an agent for Unum Life, contacted Anne Rivers Carter, the office manager of Southeastern Steam, Inc., ("Southeastern Steam") to request the opportunity to present the disability insurance plan to the company's employees and to solicit enrollment. Carter later met with Glenn and applied to Unum Life for group coverages on behalf of Southeastern Steam. R.Exh. at 19-20; id. Exh. 3. She signed a "Client Information" form, through which she selected various eligibility requirements for the disability plan, including a 90-day waiting period and a 35-hour minimum workweek requirement. Id. Exh 3.

On 24 April 1997, Glenn "met with company employees individually" to discuss coverage under the plan. R4-30 Exh. 1 at 6. Carter stated that publicity was conducted by "word of mouth, like, . . . there's a guy coming, if you want disability insurance, you can meet with him . . . he'll explain it to you." R.Exh. at 23. No representative from Southeastern Steam was present during these meetings. The decision on whether to sign up for disability insurance was left to the individual employee. Those who wished to enroll completed Disability Program Enrollment Forms, which Glenn drafted and provided. The forms stated,

"Southeastern Steam, Inc. is offering a comprehensive Disability program to protect you and your family in the event a non-occupational accident or sickness causes you to miss work." R4-30 Exh. 2B. Carter, who signed up for the plan, later stated that she never read this statement and that she believed Unum Life, rather than Southeastern Steam, was providing the plan. At the meetings, Glenn also discussed the benefits and premium amounts with each employee.

Carter testified that Southeastern Steam revised its employee handbook to include a reference to the plan in question, which was the only disability plan offered to the employees during that time. R.Exh. at 46. Under the heading "Benefits," Southeastern Steam's employee handbook stated: "The company makes available to employees access to benefits designed to meet the needs of employees and provide protection from financial hardship. These benefits will be reviewed periodically to assure that they keep pace with area practice and employee needs." Id. Exh. 5 at 22. In the same section, under the subheading "Disability Insurance," the handbook stated, "Disability insurance is available to all full-time employees. The premium for this coverage is the sole responsibility of the employee." Id. Exh. 5 at 23.

At the time of their enrollment, the participating employees were not provided copies of the plan nor any other written documents, apart from the enrollment forms themselves. The plan booklets and included certificates were

4

later mailed to Carter, who filed them in a closet at Southeastern Steam. Carter testified that, while she did not widely distribute the booklets, she gave a booklet to Moorman and kept one for herself. Id. at 76. The plan certificate provides, inter alia, that: "[t]his policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments." Id. Exh. 6 at 1. The Summary Plan Description designated Southeastern Steam as the plan administrator and as the agent for service of legal process on the plan. Id. Exh. 6 at 60-61.

Enrolled employees were required to pay their entire premium amounts on a post-tax basis. Carter collected employee premiums from employees by way of payroll deductions and remitted them to Unum Life by writing a check from Southeastern Steam's account. Id. at 33-34. While she provided Unum Life's 1-800 number to certain employees who asked questions regarding their claims and benefits, Carter also admitted that she personally "may have tried to help" employees who had such questions. Id. at 42, 52. Carter further stated that she had on file some blank forms that Unum Life had given her. Id. at 44. When one employee made a claim under the plan, Carter provided a form to that employee, and she completed and submitted the employer verification form to Unum Life. Id. at 44, 102-03; R4-30 Exh. 1 at 15-16. She also submitted an employer verification

5

form for Moorman, when he filed his claim.  R4-30 Exh. 1 at 15-16

Moorman, formerly employed by Southeastern Steam signed up for the plan during the 24 April 1997 meeting with Glenn.  In February 1999, Moorman was diagnosed with rectal cancer.  After he initially qualified as disabled under the plan, the Appellees determined that he no longer satisfied the definition of disability.  Moorman disputed the denial of his disability benefits to the Appellees but he was unsuccessful.  On 16 July 2004, Moorman filed the complaint in this case, in which he alleged the wrongful denial of disability benefits and various other state and federal law claims.  On 26 August 2004, Appellees filed their motion to dismiss.  On 22 October 2004, the district court converted the Appellees' motion to dismiss to a motion for summary judgment on the issue of whether the plan is governed by ERISA, which would preempt Moorman's state law claims.

In a subsequent order on 17 February 2005, from which this appeal is taken, the district court: (1) granted Appellees' converted motion for summary judgment in ruling that the plan was governed by ERISA; (2) granted Appellees' motion to dismiss Moorman's state law claims on grounds of ERISA preemption; and (3) denied Appellees' motion to dismiss Moorman's federal RICO claim.  On 4 March 2005, Moorman filed (1) a motion for reconsideration; (2) an alternative motion seeking certification for interlocutory appeal; and (3) a motion to stay proceedings.

On 25 July 2005, the district court (1) denied Moorman's motion for

6

reconsideration; (2) granted Moorman's alternative motion for certification for interlocutory appeal; (3) denied Appellees' request for certification for interlocutory appeal of the district court's refusal to dismiss Moorman's federal RICO claims; (4) granted Moorman's motion to stay proceedings; (5) denied without prejudice certain discovery motions filed by Moorman; and (6) ordered that the district court case be administratively terminated until remanded per the instructions of our court. We later granted Moorman's interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## II. DISCUSSION

On appeal, Moorman alleges that the district court committed various errors in determining that ERISA governs the plan in this case. Specifically, he claims that the district court (1) improperly limited discovery; (2) improperly determined that ERISA governance was a question of fact for the district court, and not the jury, to decide; and (3) made an impermissible credibility determination with regard to a witness, and improperly construed and disregarded other evidence favorable to Moorman. With regard to Moorman's federal RICO claims, Appellees ask us to review whether this claim should be dismissed. After a brief examination of the relevant background law, we address these issues in turn.

A.  Relevant Background Law

    1. Standards of Review:

We review de novo the grant of a motion for summary judgment. Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1262 (11th Cir. 2004). Federal Rule of Civil Procedure 56(c) requires summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." In deciding a summary judgment motion, the court must view all the evidence in the light most favorable to the nonmoving party, and resolve all disputes and draw all inferences in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); see also Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999). We review the denial of a discovery order for abuse of discretion. Burger King Corp., 169 F.3d at 1315.

2. ERISA Law Generally

a. Purpose

Congress created ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S. Ct. 948, 956 (1989) (citations and quotations omitted); see also 29 U.S.C. § 1001 (listing the congressional findings and declaration of policy regarding ERISA); Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1184 (11th Cir. 2004) ("ERISA's purpose [is] to promote the interests of employees and their beneficiaries.").

8

b. Governance

ERISA governs employee welfare benefit programs provided by an employer. See 29 U.S.C. § 1001 et seq. An employee welfare benefit plan governed by ERISA is "any plan, fund, or program . . . established or maintained by an employer" to provide benefits through an insurance policy. 29 U.S.C. § 1002(1); see Donovan v. Dillingham, 688 F.2d 1367, 1371 (11th Cir. 1982). However, "no single act in itself necessarily constitutes the establishment of the plan, fund, or program." Donovan, 688 F.2d at 1373. Rather, "it is the reality of a plan and not the decision to extend certain benefits that is determinative." Id. An ERISA plan "is established if from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Id.

c. Safe Harbor Exemption

The United States Department of Labor explicitly exempts from ERISA governance certain "group or group-type insurance programs offered by an insurer to employees." 29 C.F.R. § 2510.3-1(j). There are four elements necessary to satisfy the safe harbor exemption: "(1) [n]o contributions are made by an employer or employee organization; (2) [p]articipation in the program is completely voluntary for employees or members; (3) [t]he sole functions of the employer . . . with respect to the program are, without endorsing the program, to permit the

9

insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and (4) [t]he employer receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services." Id.

B.  Whether the District Court Made Specific Errors in Determining that ERISA Governs the Plan

  1.  Whether the District Court Improperly Limited Discovery

 Moorman complains that the district court improperly limited his discovery regarding questions of ERISA governance and preemption when it denied his motion for leave to depose Appellees' witnesses and for additional time to submit summary judgment materials.  However, Moorman never specifically identifies in his brief the issues on which he sought discovery.  In denying Moorman's motion, the district court correctly noted that this new discovery request related to the issue of whether the Southeastern Steam had contributed to the plan.  The court then observed that the Appellees had withdrawn any contention that Southeastern Steam had contributed to the plan.  Mindful that the standard of review for denials of a discovery order is abuse of discretion, we conclude that Moorman's argument on this issue fails.

  2.  Whether ERISA Governance Is a Question of Fact for the Jury

In addition, Moorman argues that the district court erred because it stated that the issue of whether ERISA governs the plan is a fact question for the district court to determine. According to Moorman, because the district court already has jurisdiction based on other claims, the district court has no need to determine the factual existence of ERISA governance for jurisdictional purposes, and therefore this question of fact should be determined by a jury. In its order, however, the district court indicated that it would follow "the general restrictions placed on it at the summary judgment stage, resolving issues based on material undisputed facts." R7-59 at 5. Notwithstanding any arguable errors in applying this standard by the district court, this issue need not be resolved on appeal because the appeal concerns only our de novo review of the threshold question of whether there is a genuine issue of material fact as to whether ERISA governs the plan. This question is necessarily for courts, and not juries, to decide. See Mackenzie v. City of Rockledge, 920 F.2d 1554, 1558 (11th Cir. 1991).

3. Whether the District Court Made an Impermissible Credibility Determination and Improperly Construed and Disregarded Other Evidence

Insofar as the district court may have erred in making an impermissible credibility determination,[1] or in improperly construing and disregarding other

_____

[1]Credibility determinations at the summary judgment stage are impermissible. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000). While our review of the district court's grant of summary judgment is de novo, and any

11

credibility determinations by the district court are properly disregarded, we believe it is appropriate to address the issue of whether there in fact was an impermissible credibility determination made by the district court. Our decision is based in part on the amount of attention devoted by Moorman in his brief on appeal regarding this issue.

The allegedly impermissible credibility determination concerns Carter's affidavit. The district court stated that:

> Although the court realizes it should not be engaged in credibility analysis, Carter herself acknowledged that she did not read her Affidavit closely before signing it. Therefore, the court will not rely on the averments of Carter's Affidavit, particularly those contradicted by other evidence in this case.

R7-41 at 17-18 n.16

This conclusion was predicated on the following exchange between Carter and counsel for the Appellees:

> Q. [Counsel for Appellee] Okay. Well, your affidavit says in paragraph 31, acting on behalf of Southeastern Steam, I received the plan booklets as mailed by defendant Unum Life and distributed those to individual enrolled employees, including plaintiff Moorman. Is it your testimony –
> A. [Ms. Carter] No, I didn't.
> Q. – today that that is not correct?
> A. Yeah, I didn't distribute, I didn't distribute to the employees. He [Moorman] asked for one. If anybody came and asked for one, Mr. Moorman did ask for one. And I think I actually got one and took it home with me, but, no, I didn't distribute.
> Q. Well, did you review your affidavit before you signed it?
> A. Yeah, but, I mean, I just – not every word like that.
> Q. Well, did you not read every word before you signed it?
> A. Yeah, but it didn't click.

R.Exh. at 75-76. Moorman contends that this was an impermissible credibility determination and that Carter's statements should not be read for the proposition that she did not read her affidavit closely before signing it.

If the district court used this exchange to discount completely Carter's affidavit, then there may be error. Construing the facts in the light most favorable to Moorman, the exchange would call into question Carter's statements in her affidavit regarding her "distribution" of the materials.

In any event, it is unclear exactly how the district court treated Carter's affidavit. For example, the court did accept Carter's statements that she "believed Unum Life, rather than

12

evidence favorable to Moorman, this analysis is subsumed within our overall de novo review of whether there is a genuine issue of material fact on ERISA governance, which is examined below.

## C. Whether There Is a Genuine Issue of Material Fact on ERISA Governance

In his brief on appeal, Moorman argues that the "controlling questions of law" in this case are the alleged laundry list of errors by the district court in applying the summary judgment standard of review. See Appellant's Br. at 4-5. This misses the point. In applying de novo review, "we review the judgment, not the soundness of the district court's explanation for it." Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1151 (11th Cir. 2005); see also SEC v. ETS Payphones, Inc., 408 F.3d 727, 736 n.10 (11th Cir. 2005) (per curiam) ("We review the district court's judgments; we do not grade the opinions."). Thus, even if the district court erred by improperly making a credibility determination or by misconstruing and disregarding certain evidence, Moorman still must show that there is a genuine issue of material fact as to ERISA governance.

### 1. Safe Harbor Analysis

The requirements for a safe harbor exception under 29 C.F.R. § 2510.3-1(j)

---

Southeastern Steam, was providing the Plan." R7-41 at 3. Moreover, even if the district court were to have accepted her affidavit without reservation, Carter's legal conclusions about whether ERISA applied and any ruminations on what other employees thought of the plan and relevant documents were properly disregarded.

are strict. See Butero v. Royal Maccabees Life Ins. Co, 174 F.3d 1207, 1213 (11th

Cir. 1999) (noting that the safe harbor regulation "explicitly obliges the employer

who seeks its safe harbor to refrain from any functions other than permitting the

insurer to publicize the program and collecting premiums"). Thus, the safe harbor

analysis is usually conducted before considering whether the plan is governed by

ERISA using the more factor-intensive analysis under 29 U.S.C. § 1002(1).

Anderson, 369 F.3d at 1263 n.2.

Appellees concede that three of the four elements of the safe harbor

exemption are met. The only element in contention is whether "(3) [t]he sole

functions of the employer . . . with respect to the program are, without endorsing

the program, to permit the insurer to publicize the program to employees or

members, to collect premiums through payroll deductions or dues checkoffs and to

remit them to the insurer." 29 C.F.R. § 2510.3-1(j) (emphasis added). According

to the Department of Labor:

> An employee organization will be considered to have endorsed
> a group or group-type insurance program if the employee organization
> expresses to its members any positive, normative judgment regarding
> the program. An employee organization may, in the course of
> permitting an insurer, insurance agent, or insurance broker to market
> the group or group-type insurance program to its employees or
> members, facilitate the publicizing and marketing of the program, but
> only to an extent short of endorsing the program. An endorsement
> within the meaning of [§] 2510.3-1(j) occurs if the employee
> organization urges or encourages member participation in the program
> or engages in activities that would lead a member reasonably to

14

> conclude that the program is part of a benefit arrangement established
> or maintained by the employee organization.

ERISA Op. Letter No. 94-26A, 1994 WL 369282 (July 11, 1994) (emphasis added). For our purposes, the safe-harbor analysis turns on whether the employer "endorsed" or undertook any additional "function[] . . . with respect" to the plan within the meaning of § 2510.3-1(j).

In Butero, we determined that the employer had endorsed the plan because it had chosen the insurer, "decided on key terms," "deemed certain employees ineligible" for participation, "incorporated the policy terms into the . . . summary plan description for its cafeteria plan," and "retained the [ability] to alter compensation reduction for tax purposes." 174 F.3d at 1213-14. While the issue was not appealed to our court, the district court in Anderson concluded that an employer's actions rose to the level of endorsement when "it singled out the UNUM Plan as the sole plan it offers to its hourly employees, played a role in selecting the premium rates, restricted employee eligibility, displayed its corporate logo on the policy documents which it provided to [its] employees, was named in the policy documents as the plan administrator, and provided a summary plan description to its employees that specifically referred to ERISA." Anderson, 369 F.3d at 1262 (citing Anderson v. UnumProvident Corp., 322 F. Supp. 2d 1272, 1276-79 (M.D. Ala. 2002)).

15

Under the mandate of Butero, which states that "any functions" by the employer apart from the two listed exceptions disqualify a plan from the safe harbor exception, the plan at issue in this case does not qualify for this exception. See Butero, 174 F.3d at 1213. Here, even though only one nonlisted employer function would disqualify the plan under the safe harbor exception, several actions by Southeastern Steam stand out as "endorsement" for the purposes of § 2510.3-1(j).

First, as the district court noted, "it is undisputed that Southeastern Steam decided on at least one of the eligibility terms under the Plan, the waiting period." R7-41 at 24. Moorman himself concedes in his brief on appeal that Southeastern Steam determined the waiting period. Appellant's Br. at 34.

Second, similar to the district court's analysis in Anderson, the plan at issue in this case was the "sole" long term disability plan offered by Southeastern Steam to its employees. See 322 F. Supp. 2d at 1277. Specifically, there is no dispute that Southeastern Steam identified the plan in its employee handbook as part of the company's employee benefits. The employee handbook stated that "[d]isability insurance is available to all full-time employees." R.Exh., Exh. 5 at 23. Carter testified that Southeastern Steam did not offer disability insurance prior to the plan at issue in this case, that no other plans were then offered, and that the provision in the handbook was added to account for that policy. Id. at 10-11, 45-46. In

16

addition, all but one of the employees of Southeastern Steam enrolled for disability coverage at the time of the original enrollment. Id. at 57. The enrollment forms were signed by the employees, including Carter and Moorman, and included the following language: "Southeastern Steam, Inc., is offering a comprehensive Disability program . . . ." R4-30 Exh. 2B at unnumbered 3, 23.

Third, it is undisputed that Southeastern Steam maintained a limited supply of claim forms and that Carter assisted with the filings of at least one or two claim forms to Unum Life on behalf of employees. R.Exh. at 44, 102-04; R4-30 Exh. 1 at 15-16. Moorman argues that this was only a ministerial function, and that any submissions to Unum Life for claims on the part of Southeastern Steam were the employer verification forms, which were required by the insurer. Nevertheless, given Butero's low threshold for disqualification under the safe harbor exception, i.e., the fact that "any" additional function by the employer with regard to the plan bars the application, this accumulation of extraneous functions by Southeastern Steam has rendered the safe harbor inapplicable in this case. Our discussion in the next section regarding "establishment" and "maintenance" incorporates this safe harbor analysis and addresses more fully the depth of Southeastern Steam's involvement with the plan.

2. "Establishment" and "Maintenance": Statutory Coverage under 29 U.S.C. § 1002(1)

17

Even if the safe harbor is barred, "that does not necessarily mean that the insurance policy is part of an ERISA plan." Butero,174 F.3d at 1214; see also Anderson, 269 F.3d at 1263 n.2 ("[A] plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA.").

The defendants must show five things to establish that an ERISA plan governs its relationship with Plaintiff: "(1) a plan, fund, or program (2) [that has been] established or maintained (3) by an employer . . . (4) for the purpose of providing . . . disability . . . benefits (5) to participants or their beneficiaries." Donovan, 688 F.2d at 1371(internal quotations omitted). The only contested factor is the third, whether the employer, Southeastern Steam, "established or maintained" the plan within the meaning of 29 U.S.C. § 1002(1). "Our inquiry thus necessarily focuses on 'the employer . . . and [its] involvement with the administration of the plan." Anderson, 369 F.3d at 1263.

"In Butero, we suggested seven factors that may be relevant in determining whether an employee welfare benefits program has been established [by an employer]. These factors are equally important in determining whether an employer has maintained the plan: '(1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence;

18

(6) the reasonable understanding of employees; and (7) the employer's intent.'"

Id. at 1265 (quoting Butero, 174 F.3d at 1215).

We cannot help but note that the facts in this case are similar to those in Anderson, in which we determined that the employer "established and maintained" the plan. See id. at 1259-62. In applying Butero's seven listed factors to the facts in this case and incorporating our previous analysis concerning the safe harbor exception, we conclude, as we did in Anderson, that "almost all of the . . . factors provide powerful reasons to conclude as a matter of law that [the employer] both established and maintained an employee welfare benefit plan governed by ERISA." See id. at 1267.

With regard to the first Butero factor, as noted previously, Southeastern Steam stated in its employee handbook that disability insurance was an available benefit. Some courts have concluded that this alone is enough to trigger ERISA governance. See, e.g., Cockey v. Life Ins. Co. of N. Am., 804 F. Supp. 1571, 1575 (S.D. Ga. 1992) ("Where a plan is presented to employees as one belonging to the employer's benefits package, however, as opposed to merely permitting the insurer to publicize the program to employees, the plan is an 'employee welfare benefit plan' under ERISA, 29 U.S.C. § 1002(1), even though the employees pay the premiums.").

With the possible exceptions of the disclosure of Unum Life's 1-800 number

19

to certain employees and the word-of-mouth publicity for the Unum Life representative's visit to the company, which are not particularly probative of whether Southeastern Steam established or maintained the plan, there are no relevant facts discussed on appeal regarding Southeastern Steam's oral representations to its employees, so we move on to the third Butero factor. Here, Southeastern Steam, similar to the employer in Anderson, "established a fund to pay benefits [and] selected the UNUM plan as the sole long term disability plan . . . and limited eligibility to [certain employees]." See Anderson, 369 F.3d at 1265 (citation omitted). By applying for UNUM Life coverage on behalf of its employees, and deciding on key terms in the plan agreement, Southeastern Steam made the plan "a benefit closely tied to the employer-employee relationship." Id. at 1265-66.

With regard to fourth factor, Anderson is once again on point. While Southeastern Steam did "not actually pay benefits, it [was] directly involved in the payment process" because it "maintain[ed] a supply of claim forms" and "facilitated the payment of benefits." See id. at 1266. Moorman disputes the level of participation by Southeastern Steam and argues that the claim forms were filed away. However, Carter admitted that she helped employees who had questions regarding their claims and benefits and that she wrote a check on Southeastern Steam's account to pay for all of the coverages. R.Exh. at 33-34, 52. Carter also

20

assisted at least one or two employees in the filing of an actual claim.  Id. at 44,

102-04; R4-30 Exh. 1 at 15-16.

The fifth and sixth Butero factors also favor the Appellees.  It is not simply

the "subjective" understanding of individual employees like Carter (who admitted

she did not read the enrollment form) and Moorman, who maintained that they

believed Southeastern Steam was not offering the plan, but rather the viewpoint of

the objectively reasonable employee that is the primary consideration in this

analysis.  See Anderson, 369 F.3d at 1266-67; Johnson v. Watts Regulator Co., 63

F.3d 1129, 1135 (1st Cir. 1995) (conducting ERISA analysis from "the viewpoint

of an objectively reasonable employee").  Here, Southeastern Steam created and

distributed the employee handbook, which referenced the plan in question as an

available benefit for all its full-time employees.[2]  Moreover, the employees signed

the enrollment forms that indicated Southeastern Steam was offering the program.

Though there is no affirmative evidence that Southeastern Steam knew of any

misconceptions regarding the disability plan, there is likewise no evidence that

Southeastern Steam company officials, including Carter and Moorman, who signed

the enrollment forms and who received the ERISA plan booklet and certificates,

---

[2]While Carter stated that she did not distribute the plan booklets and certificates to Southeastern Steam employees, which contained explicit language regarding ERISA governance, she admitted that she gave one booklet to Moorman upon his request and took one home for herself.  R.Exh. at 76.

21

took any steps, over the course of several years, to refute the indications that Southeastern Steam was offering the plan or to provide any necessary clarifications. See Anderson, 369 F.3d at 1267 (finding relevant the fact that company officials did nothing to change the ERISA language in any of the documents until after the claim had been filed). Thus, it is clear that the Southeastern Steam employees who signed and read the enrollment form and the employee handbook could have reasonably believed that Southeastern Steam was offering the plan in question.

The seventh Butero factor favors Moorman. More specifically, while some of the actions of Southeastern Steam suggest otherwise, it does not appear, based on Carter and Moorman's affidavits, that Southeastern Steam company officials had the intent to establish or maintain the plan at issue. This factor is not dispositive, however, because ERISA can apply "regardless of the intent of the plan administrators and fiduciaries" if the plan "satisfies the statutory definition." Anderson 369 F.3d at 1264.

Even if the Butero factors demonstrate that Southeastern Steam "established" or "maintained" the plan, Moorman makes four other arguments that ERISA governance is improper in this case. First, he alleges that ERISA was not intended to cover such small employers as Southeastern Steam. This argument is unpersuasive because we have said that an ERISA plan may consist of only a

22

single employee.  See, e.g., Williams v. Wright, 927 F.2d 1540, 1545 (11th Cir. 1991).  Second,  Moorman alleges that the Appellees fraudulently inserted language regarding ERISA into plan documents and enrollment forms. Notwithstanding the fact that Southeastern Steam officials signed the enrollment forms and did nothing to refute the conspicuous ERISA language in the plan documents after the company received them, this allegation is without support from the evidence in the record.  Third, Moorman argues that Appellees never discussed the issue of ERISA governance with Southeastern Steam employees or officials.  Even assuming that Appellees had such a duty to explain, this argument also fails in light of the failure of Southeastern Steam to correct or clarify language in the enrollment forms and plan documents that reflects ERISA governance. Moreover, "ERISA does not require that a beneficiary have any knowledge of a written plan's terms."  Henglein v. Informal Plan for Plan Shutdown Benefits for Salaried Employees, 974 F.2d 391, 401 (3d Cir. 1992).  Fourth, Moorman appears to argue that any relevant actions by Southeastern Steam regarding the ERISA plan governance were taken at the behest of the Appellees.  This argument fails for two reasons:  As already discussed, there were several actions that Southeastern Steam undertook on its own initiative, most notably the inclusion of the disability plan in the employee handbook and the assistance provided by Carter to Southeastern Steam employees.  Furthermore, even if Southeastern Steam undertook actions at

23

the behest of the Appellees, our primary inquiry must be from the vantage point of the objectively reasonable understanding of the employees, who may be unaware of the motivations behind their employer's actions. See Anderson, 369 F.3d at 1266-67.

While there may be fewer facts to show that the employer established or maintained the plan than there were in Anderson and Butero, insofar as the plan booklets in this case were not widely distributed and few employees submitted claims, those cases do not represent the absolute minimum of what must be proven to show establishment or maintenance. We do not believe that Congress established ERISA to prejudice the rights of employees or to needlessly squelch state law actions that would otherwise provide a superior avenue for the vindication of such rights. Instead, as noted previously, the raison d'etre of ERISA was "to promote the interests of employees and their beneficiaries" and "to protect contractually defined benefits." Firestone Tire & Rubber Co., 489 U.S. at 113, 109 S. Ct. at 956. The bar triggering ERISA governance, therefore, should not be set too high.

Thus, reviewing the Butero factors previously discussed, and keeping in mind the underlying purposes of ERISA, we conclude that the plan in this case is governed by ERISA. In reaching this decision, we note that Moorman does not forfeit his rights against the Appellees; rather, he must litigate most, if not all, of

24

his claims under ERISA, a statutory scheme enacted by Congress to protect the rights of employees such as Moorman.[3]

## D. Moorman's Federal RICO Claims

Appellees seek dismissal of Moorman's federal RICO claims on grounds that it was inconsistent with ERISA's exclusive remedial scheme. The district court denied that portion of the motion, stating: "Defendants provide the court with no legal authority that allowing a plaintiff to proceed under RICO would frustrate the exclusive remedial scheme Congress devised for ERISA claims, and the court will not dismiss the claim on grounds for which Defendants have presented no legal authority." R7-41 at 33. In its 25 July 2005 order, which expressly refused to certify the question for appeal, the district court stated:

> [T]he court is generally unable to certify a question for interlocutory appeal when the question has not been considered by the district court. In this case, the court previously determined it would not be proper to grant Defendants' motion to dismiss Plaintiff's federal RICO claim because Defendants had not presented legal authority supporting their position. It is only now that Defendants provide the court with such authority. An issue presented for the first time on appeal will be considered only in extraordinary circumstances. The court does not believe the inclusion or exclusion of Plaintiff's federal RICO claim presents an extraordinary circumstance warranting the court's certification of the question, therefore the court will decline Defendant's request for it to do so.

---

[3]Because Moorman does not ask us to review the district court's conclusions regarding the extent to which ERISA preempts his state law claims, see Appellant's Br. at 46, we need not address that issue.

R7-59 at 27 (citations omitted).

The scope of review on appeal under 28 U.S.C. § 1292(b) "is not limited to the precise question certified by the district court because the district court's order, not the certified question, is brought before the court." Aldridge v. Lily-Tulip, Inc. Salary Ret. Benefits Comm., 40 F.3d 1202, 1207 (11th Cir. 1994). Under § 1292(b), appellate review, even for certified questions, is discretionary. McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1259 (11th Cir. 2004). "The proper division of labor between the district courts and the court of appeals and the efficiency of judicial resolution of cases are protected by the final judgment rule, and are threatened by too expansive use of the § 1292(b) exception to it. Because permitting piecemeal appeals is bad policy, permitting liberal use of § 1292(b) interlocutory appeals is bad policy." Id. By extension, review by appellate courts of noncertified questions is also discretionary. Cf. id.

There is no reason why the district court should not be afforded the opportunity to answer this question more fully in the first instance. In their motion to dismiss Moorman's RICO claim, Appellees did raise the issue before the district court, albeit briefly, and cited two cases: Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S. Ct. 1549 (1987), and Gilbert v. Alta Health & Life Ins. Co., 276 F.3d 1292 (11th Cir. 2001). R1-3 at 24. However, we note that Appellees thereafter did not request reconsideration of that court's ruling on the issue. Rather, in its

26

response to Moorman's motion for certification, Appellees for the first time requested, in the event that the district court certified the ERISA governance question for appeal, that the district court also certify the RICO question. R7-50 at 5.

The federal RICO issue is heavily briefed by Appellees on appeal, and includes new theories not raised below (e.g., the proper application of a statute concerning ERISA's preclusive effect, 29 U.S.C. § 1144, on federal laws enacted both before and after ERISA's enactment). However, Appellees failed to afford the district court the same opportunity for review. Even if this issue presents a matter of first impression in our circuit, this is not a circumstance that would warrant preemptive appellate review and resolution of an issue not fully addressed by the district court, and we decline to liberally use § 1292(b) in the manner urged by Appellees. See McFarlin, 381 F.3d at 1259.

Appellees also claim that Moorman failed to allege a viable RICO claim because it lacked particularity. This question was also not certified for appeal. For similar reasons regarding our refusal to address Appellees' first RICO argument, we will not address this issue on appeal.

### III. CONCLUSION

Moorman appeals from an interlocutory order of the district court, which concluded that ERISA governs his disability insurance plan. Because the evidence

27

in the record demonstrates that there is no genuine issue of material fact on this issue, we affirm the order of the district court.  Furthermore, we decline Appellees' invitation to review Moorman's RICO claims, which have not been certified for appeal, because they have yet to be adequately addressed by the district court.

**AFFIRMED.**