PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2014
_____

KEVIN M. MCCANN, M.D.,
                                    Appellant

v.

UNUM PROVIDENT; *HARTFORD LIFE &
ACCIDENT INSURANCE COMPANY

*(Dismissed Per Court Order dated October 12, 2017)


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-11-cv-03241)
District Judge: Honorable Mary L. Cooper
_____

ARGUED: April 26, 2018

Before:  JORDAN, BIBAS, and SCIRICA, *Circuit Judges*.

(Opinion Filed:  October 5, 2018)

Tybe A. Brett          [ARGUED]
Feinstein Doyle Payne & Kravec
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA  15219

Michael E. Quiat
Uscher, Quiat, Uscher & Russo
433 Hackensack Avenue
2nd Floor
Hackensack, NJ  07601

        *Counsel for Appellant*

Steven P. Del Mauro          [ARGUED]
Janet Nagotko
McElroy Deutsch Mulvaney & Carpenter
570 Broad Street
Suite 1500
Newark, NJ  07102

        *Counsel for Appellee*

—————————————

OPINION OF THE COURT

—————————————

SCIRICA, *Circuit Judge*.

This appeal addresses two principal issues: First, whether a group insurance plan is governed by the Employee

2

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*, and second, whether the physician–claimant was incorrectly denied his disability benefit payments.

Plaintiff–appellant, Dr. Kevin McCann, is a radiologist certified in the specialty of interventional radiology. The gravamen of this appeal concerns a supplemental long-term disability insurance policy Dr. McCann purchased from defendant, Provident Life and Accident Insurance Company. After initially issuing payments under the policy, Provident terminated Dr. McCann's disability benefits. Central to its decision was a determination that Dr. McCann was primarily practicing as a diagnostic radiologist—rather than as an interventional radiologist—at the time he became disabled. This suit followed.

As a preliminary matter, the parties dispute whether Dr. McCann's claim arises under ERISA. Thus, we first consider the outer bounds of an employer's involvement in a group or group-type insurance plan before deciding whether the plan may be governed by ERISA. The Department of Labor has promulgated a safe harbor regulation exempting certain plans from the definition of an "employee welfare benefit plan." But we conclude Dr. McCann's then-employer sufficiently endorsed the plan under which his policy was purchased to render the safe harbor inapplicable. ERISA will supply the governing framework.

As to the merits, we believe Provident incorrectly defined Dr. McCann's occupation in administering his disability claim and that the claim must be evaluated in the context of his specialty—interventional radiology. We will remand for the District Court to consider whether Dr.

3

McCann's medical conditions prevent him from being able to perform his "substantial and material duties" as an interventional radiologist, as required by the terms of the policy.

## I. Factual Background

### A. Dr. McCann's Employment at Henry Ford Hospital and Supplemental Long-Term Disability Insurance Policy

After graduating from medical school and obtaining certification as an interventional radiologist, Dr. McCann was hired by Henry Ford Hospital to serve in a two-year Graduate Trainee Physician Program. While there, Dr. McCann worked in the Hospital's Department of Diagnostic Radiology until the completion of his fellowship on June 30, 1991.

To Dr. McCann and other employees, the Hospital offered a "Base Plan" of non-contributory long-term disability benefits. The Hospital determined the Base Plan's eligibility criteria and set the available maximum monthly benefit. As relevant here, the Hospital also provided certain groups of employees with information pertaining to supplemental long-term disability insurance. Fellows, like Dr. McCann, who served in the Hospital's Graduate Trainee Physician Program were eligible to purchase supplemental insurance under the Residents' Supplemental Disability Insurance Plan (RSDP). The RSDP was funded through the purchase of individual policies and underwritten by Provident's predecessor, Unum Life Insurance Company of America. While participants paid 100% of policy premiums, all policyholders received a fifteen

percent discount based solely on their association with the Hospital.

During Dr. McCann's employment, Lucasse, Ellis, Inc. ("Lucasse") served as the Hospital's broker for insurance policies issued under the Base Plan and RSDP. Lucasse sent Dr. McCann a letter advertising the RSDP in 1991 and informing him that Provident had been chosen by the Hospital "to provide supplemental disability insurance to Ford physicians." Joint App. at 166. The letter explained that the RSDP was designed to address the "single greatest concern" for physicians—that they may be disabled within their specialty. Joint App. at 168. Specifically, Lucasse's letter stated: "Unlike many occupations, a doctor may become disabled by an injury or illness that would not preclude working in another occupation," and that "[y]our program will state . . . that your occupation is a recognized medical specialty, with its own specific duties. Thus, it is possible for you to be disabled within your specialty while you can still be a physician." *Id.*

Thereafter, Dr. McCann spoke with a Lucasse brokerage agent, David Manes. After discussing with Manes a long-term disability insurance policy he had purchased earlier from a different insurer, Dr. McCann applied to Provident for supplemental insurance coverage in May 1991. Dr. McCann's application was approved and his policy took effect on July 1, 1991.[1] Particularly relevant are the provisions relating to total disability, which state:

---

[1] At the time he became disabled, Dr. McCann's policy provided a monthly benefit of $15,000.00.

5

Total Disability or totally disabled means that due to Injuries or Sickness:

1. [Y]ou are not able to perform the substantial and material duties of your occupation; and

2. [Y]ou are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

Joint App. at 308. The policy also provides the following definition of occupation:

[Y]our occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

*Id.*

6

## B. Dr. McCann's Medical Diagnoses

Nearly fifteen years after completing his fellowship at Henry Ford Hospital, Dr. McCann began employment at Holzer Clinic in Gallipolis, Ohio. While at Holzer, between 2006 and 2010, Dr. McCann consulted a variety of medical providers for the evaluation and treatment of obstructive sleep apnea (OSA)[2], a mildly dilated ascending aortic root aneurysm,[3] hypertension, and obesity. These conditions form the basis of Dr. McCann's Total Disability claim.

First, in December 2006, Dr. Howard Linder diagnosed Dr. McCann with OSA. The condition caused Dr. McCann to experience "excessive daytime sleepiness," and Dr. Linder opined that he was "probably unable to stay alert for long periods" at work. Joint App. at 1328–29. Dr. McCann underwent a sleep study later that month to evaluate the severity of his OSA and, based upon the results of the study, Dr. Linder developed a treatment plan. The plan included using a continuous positive airway pressure (CPAP) machine at night to assist with breathing during sleep.

Shortly thereafter, Dr. McCann also began experiencing shortness of breath and dizziness. On April 16, 2007, an echocardiogram revealed his "aortic root mildly dilated at 3.71

---

[2] OSA "is a condition in which the flow of air pauses or significantly decreases during breathing while the individual is asleep due to a narrowing or blockage of the airway." Joint App. at 4054. As a result, OSA can cause interruptions in breathing patterns and excessive fatigue.

[3] "An aneurysm consists of an abnormal enlargement of a weakened area in the aortic wall." Joint App. at 4057. The aorta supplies blood pumped by the heart to the rest of the body.

[cm]." Joint App. at 2174. Several months later, Dr. McCann visited a specialist, Dr. Joseph Coselli, Chair of Cardiothoracic Surgery at the Texas Heart Institute at Baylor Medical Center, and was diagnosed with a mildly dilated aortic root aneurysm, hypertension, and obesity.

Following his diagnoses, Dr. McCann stopped working at Holzer and sent Provident a notice of claim for benefit payments in March 2008.[4] In support of the claim, Dr. Coselli submitted an Attending Physician Statement (APS) listing "restrictions" as "no lifting that ilicits [sic] Valsalva maneuver[5] otherwise no restrictions" and "limitations" as "avoid heavy lifting [and] avoid stress to help keep BP under control to prevent further dilation of aorta." Joint App. at 810.[6] Dr. Coselli also wrote a letter to Holzer Clinic in April, in which he noted Dr. McCann's hypertension and sleep apnea put him "into a high risk population for risk of further dilation of his aorta" and recommended "tight blood pressure control, weight loss and undertaking an exercise regime in order to improve [Dr. McCann's] overall functional capacity." Joint App. at 1176. Dr. Coselli further stated that "[i]n light of these restrictions, I feel it would be best if he was classified as fully disabled permanently, effective March 10, 2008." *Id.*

---

[4] Prior to ceasing work completely, Dr. McCann reduced his workload on two occasions because of OSA-related fatigue.

[5] A Valsalva maneuver is a breathing technique that requires a forceful attempted exhalation against a closed airway.

[6] Dr. Linder also submitted an APS to Provident on July 15, 2008, listing Dr. McCann's diagnoses as "obstructive sleep apnea causing daytime sleepiness" and "excessive daytime sleepiness despite CPAP." Joint App. at 1328.

## C. Provident's Initial Payment of Benefits

Provident acknowledged Dr. McCann's disability claim on April 4, 2008, and informed him that medical and financial information would be requested and reviewed to process the claim. Provident also interviewed Dr. McCann, both in person and via telephone, on numerous occasions. These interviews discussed Dr. McCann's educational and employment background, his medical conditions, and the impact of the medical conditions on his medical practice.

Regarding Dr. McCann's occupational duties, Provident requested information from Holzer. Dr. Phillip Long, Vice-Chairman of Radiology, completed a job description form estimating that Dr. McCann worked an average of 60 hours per week divided among interventional radiology (approximately 20 hours), diagnostic radiology (approximately 28 hours), fluoroscopy[7] (approximately 1 hour), night call (approximately 10 hours), and paperwork (approximately 1–2 hours).

In addition, Provident requested the Current Procedural Terminology (CPT) codes[8] related to Dr. McCann's practice. Upon receipt of the codes, Provident employed a vocational

---

[7] Described as "[p]erform[ing] barium studies under fluoroscopy in standing position wearing lead apron." Joint App. at 1014.

[8] CPT codes are five-digit, procedure-specific codes maintained by the American Medical Association used for reporting medical services and surgical procedures to third-party payers.

9

rehabilitation specialist to verify the duties of Dr. McCann's occupation as an interventional radiologist. To this end, David Gaughan submitted a report on November 13, 2008. Gaughan confirmed that Dr. Long's job description, in combination with the CPT codes, were sufficient to conclude Dr. McCann performed duties related to "Diagnostic & Interventional Radiology prior to disability." Joint App. at 1514.

Regarding Dr. McCann's medical conditions, Provident submitted Dr. McCann's file to Dr. Joseph Davids, a board-certified physician in internal medicine and cardiovascular diseases. Dr. Davids reviewed Dr. Coselli's and Dr. Linder's letters and notes as of July 2008 and concluded that "the prognosis for functional improvement is poor because it is difficult to maintain [a] level of tight BP [blood pressure] control while working in a stressful occupation, such as interventional radiology. Furthermore, an interventional radiologist will often perform Valsalva maneuvers during a procedure, which will lead to a rise in BP." Joint App. at 1455. Dr. Davids also opined that evidence of good blood pressure control might alleviate Dr. McCann's restrictions and limitations.

Following this medical review and analysis of Dr. McCann's financial and occupational information, Provident approved Dr. McCann for Total Disability payments on September 4, 2008.[9] Provident initially issued payments with a Reservation of Rights, but this reservation was later withdrawn.

---

[9] Provident also paid Residual Disability benefits to Dr. McCann from April 1, 2007 to March 10, 2008, during which time Dr. McCann was working reduced hours.

## D. Provident Reviews its Determination

Provident reexamined Dr. McCann's Total Disability status in the summer of 2009. In May, a medical consulting team consisting of Dr. Davids and a clinical consultant, Patricia Carroll, reviewed the medical records in Dr. McCann's file. Davids and Carroll recommended a 24-hour blood pressure study, which was scheduled for July 9, 2009. The results of this study were forwarded to another clinical representative and Dr. Alfred Parisi, who concluded:

> [T]he systolic BP shows good but not ideal BP control . . . The [insured's] occupation as an interventionalist would involve some pushing requirements when putting in a catheter and he would have some potential problems doing this. The act of pushing does tend to increase BP. The [insured] might also have increased stress during a difficult procedure. If the [insured] is an interventional radiologist it is reasonable that he would not be able to perform some of the interventional activities. If the [insured] does not perform much interventional radiology work, he should be able to perform many of the sedentary [occupational] requirements.

Joint App. at 2043.

11

Based on Dr. Parisi's conclusions, Provident representatives recommended scheduling another field interview and obtaining updated medical records. This included the records of Dr. Nabil Fahmy, Dr. McCann's primary care physician. Dr. Fahmy's notes from Dr. McCann's most recent visit in July stated that he was "generally doing okay with no new problems," that his "[h]ypertension [was] doing well, BP [was] under good control at home," and that Dr. McCann was "[n]on compliant with diet and exercise schedule," but taking "medications daily as recommended." Joint App. at 2204.

Provident also reviewed the treatment notes from Dr. McCann's follow-up visit with Dr. Coselli on August 10, 2009. Katharine Loring, a nurse practitioner, noted that in response to Dr. McCann's request that Dr. Coselli's office continue supporting his disability claims, she "discuss[ed] with him that his aorta is really not a size we would recommend he need disability and that many people with much larger aortas continue to work." Joint App. at 2435. She accordingly suggested Dr. McCann "do just regular radiology as a way to continue to work but with less stress." *Id.*

Dr. Coselli's notes similarly observed:

> We discussed the terminology of permanent and total disability and we agreed to disagree regarding the sequencing of events. The fact remains that over the past two years following him, his aorta has been essentially stable. Surgery is not indicated at this time – the size

12

does not dictate intervention and although there is a 30% chance that he will need surgery, it may not be for 5, 10 or 20 years.

Joint App. at 2434. This discussion was memorialized in a follow-up letter to Dr. McCann dated September 9, 2009, in which Dr. Coselli explained: "your aortic aneurysm has had only minimal increase in size since the January 2008 study, increasing from 4.0 cm to the current 4.3 cm," but that "[a]s in the original letters to Holzer Clinic, your disability classification remains unchanged." Joint App. at 2433. Dr. Coselli also informed Dr. McCann that while he was "happy to monitor [his] aorta studies, [his office was] not a medical practice, but surgical," *id.*, and that Dr. McCann should consult his primary care physician to coordinate his care.

To this end, Dr. McCann chose Dr. David Lombardi, a board-certified internist, as his local primary care physician. Following an appointment in October 2009, Dr. Lombardi submitted an APS to Provident supporting Dr. McCann's disability claim and identifying his primary diagnosis as "thoracic ascending aortic aneurysm" and his secondary diagnosis as OSA. Regarding job-related restrictions and limitations, Dr. Lombardi concluded Dr. McCann could not complete "work of any kind due to [his] cardiac condition." Joint App. at 2389.

Around this time, Provident again reviewed Dr. McCann's CPT codes for procedures performed from 2005 to 2008. Vocational analyst Christina Lubin compared the percentage of interventional procedures performed to the percentage of diagnostic procedures. Using this data, another

13

vocational analyst concluded that "interventional charges accounted for 11% – 18% of total charges" and "[i]nterventional units accounted for 6% – 11% of total units." Joint App. at 2341. Based on this information, Lubin concluded Dr. McCann "reasonably spent the majority of his time reading films and dictating interpretive reports. Interventional procedures appear to have been performed on an occasional basis." Joint App. 2579.

Provident also assembled a second medical review team to review Dr. McCann's medical files. The team included a clinical representative, Beth O'Brien, and Dr. Parisi. After reviewing all of the files, O'Brien observed that Dr. McCann's aortic aneurysm was stable and that Dr. Coselli was no longer supporting restrictions and limitations from his condition. Dr. Parisi also reviewed Dr. McCann's file and concluded that Dr. McCann should avoid lifting heavy objects (> 50 lbs.), restrict his work hours to 50 hours per week, and not work night call or night shift hours. This assessment was based on his finding that Dr. McCann's "thoracic aneurysm was not large and relatively stable, that his hypertension was reasonably controlled on medication and he was doing well with his CPAP treatment for sleep apnea." Joint App. at 2564.

In addition to reviewing Dr. McCann's files, Dr. Parisi contacted Dr. Lombardi to "obtain clarification of . . . Dr. McCann's functional capacity." *Id*. Dr. Lombardi responded via letter stating:

> I have reviewed the most recent letter from Dr. Coselli's office dated September 2009 and prior letters. I have included them for

14

your review. In these letters, Dr. Coselli, the cardiothoracic surgeon, states that Dr. McCann is fully and permanently disabled due to his condition. He indicates that the aneurysm has increased in size since a prior study. I now oversee Dr. McCann's general medical care. Given the documentation and recommendations of the cardiothoracic surgeon, I, therefore, agree and support Dr. McCann's ongoing disability application.

Joint App. at 2596.

Nevertheless, Dr. Parisi maintained his conclusion. He noted "[Dr. McCann's] hypertension is adequately controlled as evidenced by the 24 hour ambulatory blood pressure study," and that the "[m]ost recent information indicates his sleep apnea is well controlled,"[10] and he again suggested the limitations described above. Joint App. at 2607.

---

[10] Around this time, Provident requested Dr. McCann's medical records from Dr. Linder going back to March 1, 2009. Dr. Linder provided the records, which were reviewed by a Provident-employed physician, Dr. Alfred Kaplan. The records included the results of a March 2009 sleep study. Based on this study, Dr. Kaplan concluded that Dr. McCann "was tolerating the CPAP well and was not symptomatic from the sleep

15

In light of this disagreement, Provident forwarded Dr. McCann's claim file to Dr. Costas Lambrew, a designated medical officer, for an independent medical review on December 22, 2009. Dr. Lambrew's review also concluded Dr. McCann was capable of performing a modified work schedule. This assessment was based on the fact that Dr. McCann's aorta was asymptomatic and stable, Dr. Coselli's most recent treatment notes, and that Dr. McCann's "hypertension has been controlled, as reflected by his recorded home pressures and the [24-hour blood pressure study]." Joint App. at 2619. He further concluded Dr. McCann could perform "[s]ustained, full time light work as a non-interventional Radiologist, with a restriction of no heavy lifting, and reduction of . . . perceived stress by working no more than 50 hours." *Id.*

### E. Provident Terminates Dr. McCann's Benefit Payments

After the extensive communications with Dr. McCann and various medical professionals, noted above, Provident terminated benefit payments in December 2009. In its letter to Dr. McCann, Provident supported its decision by pointing to, among other things: the records from Dr. Coselli in connection with Dr. McCann's August 10, 2009 visit; recent sleep studies from Dr. Linder reporting that Dr. McCann was tolerating the CPAP machine well; its medical reviews; and the review of Dr. McCann's CPT codes.

Based on this information, Provident concluded Dr. McCann was "able to perform the duties of [his] occupation,

---

apnea[.] Consequently he was not experiencing impairing daytime somnolence." Joint App. at 2559.

maintain a regular work schedule of up to 50 hours per week with no night hours or night call" and therefore was "not Totally Disabled in accordance with the Policy provisions." Joint App. at 125. Provident noted its vocational consultant "concluded that the majority of [Dr. McCann's] practice was diagnostic radiology which involves sitting at a computer to read films." *Id.* Further, the letter stated Dr. McCann was not eligible for residual disability[11] because, "[a]lthough [he]

---

[11] Dr. McCann's policy defines residual disability as follows:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1. [Y]ou are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
>
> 2. [Y]ou have a Loss of Monthly Income in your occupation of at least 20%; and
>
> 3. [Y]ou are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement when continued care would be of no benefit to you.

17

indicated that [he] previously worked 60 hours per week, [his] ability to work 50 hours per week would not be expected to cause a reduction of [his] monthly income of more than 20%." Joint App. at 126.

### F. Dr. McCann's Appeal

Dr. McCann appealed Provident's decision and, following the termination of his benefits, visited one new consulting physician: Dr. Chandra Madala, a board-certified cardiologist. Dr. Madala addressed a letter to Dr. McCann on June 14, 2010, stating his agreement with "Dr. Coselli's letter to Holzer . . . . that [Dr. McCann was] fully and permanently disabled." Joint App. at 2841. Dr. Madala recommended continued medical management of Dr. McCann's condition with blood pressure control and lifestyle modification and noted that "[o]f particular importance is to avoid stress." *Id.* At Dr. McCann's request, Dr. Linder also drafted a letter in June, stating that Dr. McCann's diagnosis of OSA exacerbated "his hypertension which is a continuing risk factor for possible rupturing [of] his aneurysm." Joint App. at 2836. Dr. Linder further stated that "[t]reatment with CPAP certainly helps but does not eliminate the risk factor of contributing to [Dr. McCann's] hypertension." *Id.*

Provident continued to review Dr. McCann's file in connection with his appeal. On August 3, 2010, Provident met with Dr. Long to discuss Dr. McCann's occupational duties. Dr. Long did not dispute Provident's CPT code analysis, but when asked whether Dr. McCann was hired as an interventional radiologist or a diagnostic radiologist, Dr. Long

---

Joint App. at 313.

18

replied "[b]oth" and explained that interventional radiologists do both things. Joint App. at 3148. He noted that nine radiologists perform diagnostic radiology at Holzer, with work evenly divided among the practicing radiologists, but that only three also perform interventional radiology, and that Dr. McCann would not have been hired by Holzer if he did not perform some interventional radiology. Dr. Long also explained that in the same amount of time it can take to do an interventional procedure, *e.g.*, an angioplasty, he can probably read more than 10 MRIs. Finally, when asked whether Holzer would consider hiring Dr. McCann again, Dr. Long stated Holzer might if Dr. McCann "could work as a diagnostic radiologist who could also perform on-call work." Joint App. at 3151.

Provident also conducted another medical review. In September, Dr. Paul Sweeney, a board-certified internist with a subspecialty in cardiology, evaluated Dr. McCann's file. In his review, Dr. Sweeney observed "[t]he medical record clearly documents an asymptomatic mildly dilated ascending aorta," but that "aggressive efforts and blood pressure control, lipid management, and weight reduction" were still appropriate. Joint App. at 3198. Dr. Sweeney also concluded from Dr. Coselli's office records that "there is no longer any valid rationale" which "would prevent Dr. McCann from resuming on a full-time basis his previous occupation as an interventional and diagnostic radiologist." *Id.* Specifically, Dr. Sweeney found "no restrictions on standing, sitting, or walking. Dr. McCann can occasionally climb and operate heavy machinery. He can frequently twist and reach above shoulder level. He can continuously lift up to 10 pounds, frequently lift 11–20 pounds, and occasionally lift 21–100 pounds." Joint App. at 3199.

19

## G. Provident's Final Determination

Following Dr. Sweeney's review, Provident upheld its decision in a letter to Dr. McCann's counsel dated September 20, 2010. Again emphasizing review of Dr. McCann's CPT codes, and the August 10, 2009 follow-up visit with Dr. Coselli, Provident explained that "Dr. Coselli released Dr. McCann to 'regular radiology', which is primarily what Dr. McCann was doing prior to his claim for disability, as evidenced by the CPT code review." Joint App. at 152. While based on Dr. Sweeney's conclusions, Provident concluded Dr. McCann could perform both the diagnostic and interventional components of his occupation, Provident also noted that even if Dr. McCann could not perform his interventional duties, because interventional duties accounted for a small part of his practice, he would not qualify for Residual Disability.

In addition, Provident explained its initial payments of Total Disability were based on an "incorrect understanding of [Dr. McCann's] occupation." Joint App. at 155. "[D]espite the fact that Dr. McCann was hired by and listed by Holzer Clinic as an Interventional Radiologist," the letter stated, "his CPT codes clearly reflect that, in the years prior to disability, Dr. McCann was practicing primarily as a Diagnostic Radiologist." Joint App. at 153. Because the restrictions and limitations described by physicians (*i.e.*, lesser work load and no night work) "would not prevent Dr. McCann from performing the substantial and material duties of his occupation, which were primarily diagnostic in nature," *id.*, Provident maintained its decision to terminate Dr. McCann's Total Disability payments.

20

## II. Procedural History

Dr. McCann brought suit under ERISA in federal court seeking payment for all past due benefits and reinstatement of his monthly Total Disability payments. Despite citing ERISA as the basis for federal jurisdiction, Dr. McCann contested ERISA's applicability before the District Court, arguing the policy was not part of the RSDP nor a separate employee welfare benefit plan. Alternatively, Dr. McCann argued a safe harbor regulation promulgated by the Department of Labor removed the policy from ERISA's purview.

Concluding the RSDP was an employee welfare benefit plan within the meaning of ERISA, and that the safe harbor criteria were not satisfied, the District Court asserted jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. The District Court further found that ERISA preempted Dr. McCann's breach-of-contract claim, but that Dr. McCann's claim could reasonably be construed as a claim under ERISA § 502(a), 29 U.S.C. § 1132(a), which provides a cause of action for plan participants who are denied benefits.

The parties subsequently filed cross-motions for summary judgment as to the merits of Dr. McCann's claim to benefits. Reviewing Provident's denial of benefits *de novo*, the District Court found Dr. McCann had failed to meet his burden of demonstrating Provident's determination was incorrect. The court reasoned Provident had not incorrectly administered its medical review because Dr. McCann failed to provide objective evidence of job-related restrictions and limitations, and that Provident's determination with respect to Dr. McCann's occupation was not incorrect. Furthermore, the court agreed with Provident that any claim for Residual

21

Disability benefits under the policy was untimely because Dr. McCann did not submit a claim for residual benefits before Provident's final determination.

This timely appeal followed.

### III. ERISA's Applicability

As a threshold matter, we address whether Dr. McCann's policy is governed by ERISA. This question is not only one of jurisdiction,[12] but also of practical import. "[T]he substitution of ERISA principles . . . for state-law principles can make a pronounced difference." *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1131 (1st Cir. 1995). ERISA preempts parallel state law remedies—here, the breach-of-contract claim Dr. McCann has raised against Provident. *See, e.g., Wirth v. Aetna U.S. Healthcare*, 469 F.3d 305, 309 (3d Cir. 2006). But beyond this, ERISA's applicability also determines such entitlements as those to a jury trial, *see Cox v. Keystone Carbon Co.*, 894 F.2d 647, 650 (3d Cir. 1990), and punitive damages, *see Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir. 1989).

---

[12] Dr. McCann renews his challenge to ERISA's applicability on appeal but this challenge does not implicate our subject-matter jurisdiction. The parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. We therefore have jurisdiction under 28 U.S.C. § 1291 whether or not ERISA governs. But if we were to conclude jurisdiction derives from the parties' diversity, state substantive law would govern the interpretation of Dr. McCann's policy.

By its terms, ERISA applies to insurance policies obtained through (1) a plan, fund, or program (2) that is established or maintained (3) by an employer (4) for the purpose of providing benefits (5) to its participants or beneficiaries. *See* 29 U.S.C. § 1002(1); *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc). This appeal concerns the second requirement that a plan, fund, or program be "established or maintained" by the employer.[13] We must interpret the U.S. Department of Labor's safe harbor regulation describing when, and to what extent, an employer may be involved with an employee welfare benefit plan without establishing or maintaining it. *See* 29 U.S.C. § 1135

---

[13] On appeal, Dr. McCann challenges only the District Court's determination as to the regulatory safe harbor. "Whether a plan exists within the meaning of ERISA is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (internal quotation marks and citation omitted). But the interpretation of a regulation also presents a legal question, thus, this issue presents a mixed question of law and fact. We review *de novo* the District Court's interpretation of the safe harbor criteria but will reverse factual findings made in connection with the criteria only if clearly erroneous. *See Johnson*, 63 F.3d at 1132 (explaining that the safe harbor's applicability "may require factfinding, and if it does, that factfinding is reviewed only for clear error"); *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 434–5 (6th Cir. 1996) (describing application of the safe harbor as a "factual inquiry"); *Pacificare Inc. v. Martin*, 34 F.3d 834, 837 (9th Cir. 1994) (applying the clearly erroneous standard to factual findings in this context).

23

(authorizing the Secretary to promulgate interpretive regulations).

In relevant part, the safe harbor provides that an "employee welfare benefit plan" or "welfare plan" is not covered by ERISA when:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable

> compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j). All four of the safe harbor's criteria must be established for an otherwise qualified plan, fund, or program to be exempt from ERISA's coverage, *see Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 293 (3d. Cir. 2014), and that burden rests with the party asserting the exception. But a program that fails to satisfy any one criterion is not necessarily "established or maintained" by the employer. *See, e.g., Johnson*, 63 F.3d at 1133; *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 n.2 (11th Cir. 2004); *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 463 (10th Cir. 1997); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 976 (5th Cir. 1991), *abrogated on other grounds by CIGNA Corp. v. Amara*, 563 U.S. 421 (2011).

In the present appeal, Dr. McCann is the party who asserts that the safe harbor exempts his policy from ERISA's requirements. Thus, he bears the burden of proof that the policy fulfills the safe harbor's four criteria. Provident does not dispute that the RSDP was completely voluntary and that Henry Ford Hospital received no compensation in connection with the program, establishing the second and fourth criteria.[14]

---

[14] Provident asserts, however, our statement in *Menkes* that "no authority. . . suggest[s] that . . . closely related components of an overarching welfare benefit plan ought to be unbundled," 762 F.3d at 291, is fatal to Dr. McCann's safe harbor argument.

We therefore consider whether Dr. McCann has established the remaining criteria—whether Henry Ford made "contributions" to or endorsed the RSDP—but find the question of endorsement to be the dispositive one.

### A. Background

ERISA was enacted "to protect . . . the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001; *see also Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 362 (1980) (discussing ERISA's enactment and purpose). This goal manifests itself in the statutory text, including, for example, the fiduciary duties applicable to the management of both pension and non-pension benefits. *See* 29 U.S.C. §§ 1101–1114.

*See also Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 10 (1st Cir. 2013) ("[The insured's] argument that the safe harbor exception applies depends on her assumption that the LTD policy may be examined independently from the rest of Pinnacle's insurance benefits plan."). But in *Menkes*, we emphasized that "[a]ll of the characteristics of the Basic Policies and Supplemental Coverage indicate that they are not two separate sources of coverage, but two parts of one broader benefits plan," because all policies were governed by a single group contract between the company and the insurer and because all of the information regarding benefit terms, rules, exclusions, and claim procedures for the policies were the same and contained in the same documents. 762 F.3d at 291. Provident points to no facts in the record which would resolve this factually intensive inquiry and so we will examine the RSDP independently from Henry Ford Hospital's Base Plan of non-contributory benefits, as did the District Court.

Mindful of this purpose, the Department of Labor's safe harbor regulation "operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards." *Johnson*, 63 F.3d at 1133. This is clear from the proposed rule's preamble, in which the Department of Labor explains the safe harbor applies where "[t]he involvement of the employer or employee organization in such programs is so minimal that the program cannot be said to be 'established and maintained by an employer.'" 40 Fed. Reg. 24642, 24643 (June 9, 1975).

As we interpret the Department's safe harbor, we recognize that "[t]he basic tenets of statutory construction hold true for the interpretation of a regulation." *Burns v. Barnhart*, 312 F.3d 113, 125 (3d Cir. 2002). Where the language of a regulation is plain and unambiguous, we need not inquire further. *See id.* But this is not such a case and we will, therefore, consider the ordinary and natural meaning of the regulatory language within its context and the safe harbor's overreaching purpose. In this case, the record is more developed on the issue of endorsement. Because we find Henry Ford Hospital's actions sufficient to fall within the meaning of endorsement, we leave for another day the meaning of contribution.

### B. Whether Henry Ford Hospital Endorsed the RSDP

The third criterion for establishing eligibility for the ERISA safe harbor requires that "[t]he sole functions of the employer . . . are, without endorsing the program, to permit the insurer to publicize the program to employees or members

27

[and] to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer." 29 C.F.R. § 2510.3-1(j). This case concerns the contours of endorsement.

Beginning with the ordinary meaning of "endorse," to endorse something is generally to indicate approval or support. *See, e.g.*, Oxford English Dictionary 162–63 (Compact ed. 1987) (defining "endorse" as to "vouch for" and "endorsement" as "approving testimony"); Webster's Third New International Dictionary 749 (1964) (similarly defining "endorse" as "to vouch for" and "to express definite approval or acceptance of"). This aligns well with the final rule's preamble, which conceptualized the third criterion as a "requirement of employer neutrality"—"the key to the rationale for not treating such a program as an employee benefit program." 40 Fed. Reg. 34526, 34527 (Aug. 15, 1975).

In view of this, we conclude the key inquiry for endorsement is whether an employer has strayed from the equilibrium of neutrality. "If an employer offers no welfare benefit plan to its employees but leaves each employee free to shop around," *Brundage-Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 510 (7th Cir. 1989), neutrality is apparent. Where the employer takes one step further, merely permitting an insurer to publicize the program and performing only ministerial tasks, the visage of neutrality remains. *See, e.g.*, *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1213 (11th Cir. 1999) (explaining the safe harbor "explicitly obliges the employer" to "refrain from *any* functions other than permitting the insurer to publicize the program and collecting premiums"); *Johnson*, 63 F.3d at 1137 (noting "the safe harbor may be accessible" where "it reasonably clear that the program is a third party's offering"). But at some point, an employer's

28

actions sufficiently compromise neutrality to an extent that triggers ERISA's "uniform regulatory regime." *Menkes*, 762 F.3d at 293 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). In identifying this point, we are aided by the decisions of our sister circuits.

At the outset, however, we emphasize that endorsement may take many forms. Our inquiry is not a checklist but a holistic assessment of the employer's "involvement with the administration of the plan." *Anderson*, 369 F.3d at 1263 (quoting *Hansen*, 940 F.2d at 978); *see also Gaylor*, 112 F.3d at 464 (looking to the "degree of participation by the employer"). While objective, this inquiry should also consider the viewpoint of the employee. *See Thompson*, 95 F.3d at 436–37; *Johnson*, 63 F.3d at 1134 (finding "a communication to employees indicating that an employer has arranged for a group or group-type insurance program would constitute an endorsement" if it leads a reasonable employee to believe the program is established or maintained by the employer).[15]

So when does an employer stray from neutrality? We conclude endorsement exists where there is some showing of material employer involvement in the creation or administration of a plan. As might be conveyed by the most natural understanding of the term, this involvement may manifest as an expression of encouragement. In *Hansen v.*

---

[15]We note this is consistent with the Department of Labor's interpretation that endorsement exists if the employer "engages in activities that would lead a member reasonably to conclude that the program is part of a benefit arrangement established or maintained by the employee organization." Dep't of Labor Op. No. 94–26A (1994).

*Continental Insurance Company*, for example, the Fifth Circuit emphasized that the employer had provided employees a booklet with its name and logo that "encouraged the employees to consider carefully participating in the group accidental death and dismemberment plan, as it would be 'a valuable supplement to your existing coverages.'" 940 F.2d at 978; *cf. Johnson*, 63 F.3d at 1139–41 (finding no endorsement where the employer's communication to employees stated the decision was "entirely an individual one").[16]

Material involvement may also constitute determining an insurance program's eligibility criteria and selecting the insurance company. "The requirements for a safe harbor exception under 29 C.F.R. § 2510.3–1(j) are strict," *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1267 (11th Cir. 2006), and the employer need only play a limited role in the creation of the insurance program for neutrality to be compromised.[17] Where an employer selects the insurer,

---

[16] The Department of Labor likewise considers an employer to have endorsed a program where it "expresses to its members any positive, normative judgment regarding the program." Dep't of Labor Op. No. 94–26A (1994).

[17] This mirrors the showing courts have required outside of the safe harbor context for a plan, fund, or program to be "established or maintained" by the employer, and thereby subject to ERISA's coverage. *See, e.g.*, *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 789 (3d Cir. 1998) (noting that an employer "can establish an ERISA plan rather easily" (quoting *Credit Managers Ass'n of S. California v. Kennesaw Life & Acc. Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987))); *Int'l Res., Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991) (same). Unless the employer "is a mere

particularly as the sole provider, and limits eligibility criteria, these facts make the plan "a benefit closely tied to the employer-employee relationship." *Anderson*, 369 F.3d at 1265 (making this observation where an employer selected an insurer as the sole long term disability plan offered and limited eligibility to hourly employees); *see also Butero*, 174 F.3d at 1213–14 (finding endorsement where the employer picked the insurer and deemed certain employees ineligible to participate); *Moorman*, 464 F.3d at 1268 (finding endorsement where the employer decided on at least one of the eligibility terms and identified the plan in its employee handbook as part of the company's employee benefits). Thus, in *Thompson*, the Sixth Circuit found sufficient employer involvement "where the employer plays an active role in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or the benefits provided thereunder." 95 F.3d at 436.

This conclusion echoes across other circuits as well. *See Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 417 (4th Cir. 1993) (ERISA plan existed where employer determined benefits, negotiated terms of coverage, and paid premiums); *Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 10 (1st Cir. 2013) (emphasizing that eligibility for a policy was not only tied to employment at the company, but the company also "determined which employees had access to that benefit. Consequently, both in outward appearance and internally, [the employer] played more than a bystander's role"); *Brundage-*

---

advertiser who makes no contributions on behalf of its employees," the establishment requirement will be satisfied. *Gruber*, 159 F.3d at 789 (quoting *Credit Managers Ass'n*, 809 F.2d at 625).

*Peterson*, 877 F.2d at 511 ("An employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation."). In *Johnson*, the First Circuit found endorsement lacking only where the employer "had no hand in drafting the plan, working out its structural components, *determining eligibility for coverage*, interpreting policy language, investigating, allowing and disallowing claims, handling litigation, or negotiating settlements." 63 F.3d at 1136 (emphasis added).

Turning to the case at hand, the question of endorsement is close. Lucasse's letter to Dr. McCann regarding the RSDP states, "[Provident] understand[s] your ability to participate in this plan is limited by the fact that disposable income is probably pretty tight. We have been able to mitigate this problem by achieving a plan design and pricing structure expressly for residents, which makes the premium affordable." Joint App. at 166. This suggests Henry Ford Hospital had no involvement in determining the substance of Dr. McCann's supplemental insurance policy or in the RSDP's administration. Nonetheless, Dr. McCann has failed to demonstrate that a reasonable employee would view the plan merely as a third-party offering, and it appears that sufficient indicia of endorsement are present to preclude application of the safe harbor.

Several facts are of particular importance. First, residents were not presented with a menu of options or free to select any insurer. To the contrary, Henry Ford Hospital selected Provident as the sole provider of supplemental disability insurance for the RSDP. *See McCann v. Unum*

*Provident*, 921 F. Supp. 2d 353, 368 (D.N.J. 2013). The Hospital also acted to encourage enrollment in the RSDP and expressed some judgment about the plan because its broker explained Provident "is the industry's leader in individual disability coverage for physicians" and was "chosen by the Henry Ford Medical Group to provide supplemental disability insurance to Ford physicians." Joint App. at 166. A reasonable employee could conclude the Hospital was endorsing the plan from this language.

Furthermore, the District Court found that the Hospital determined eligibility for the RSDP.[18] *See McCann*, 921 F. Supp. 2d at 360. As noted, this is sufficient to compromise the appearance of neutrality because the Hospital played a material role in creating the RSDP. The District Court also found a perception of endorsement "would rise from and be fostered by the agreements repeatedly executed by [Dr.] McCann and the Hospital, wherein the Hospital agreed to provide disability insurance as part of its standard benefits package." *Id.* at 368. This finding goes to the core of endorsement's purpose—that the plan not be perceived as a benefit of employment.

---

[18] At oral argument, Dr. McCann's counsel contested the origins of Dr. McCann's policy and its relation to the RSDP. *See* Transcript of Oral Argument at 6, 10–11, *McCann v. Unum Provident* (No. 16-2014) (3d Cir. April 26, 2018); *see also* Appellant's Reply Br. at 26 ("The Policy was not part of a program of benefits available to current Hospital employees or of the RSDP."). But counsel fails to point to any evidence in the record which would suggest the District Court's finding that Dr. McCann was a participant in and a beneficiary of the RSDP, *see McCann*, 921 F. Supp. 2d at 370, is clearly erroneous.

For these reasons, Dr. McCann fails to establish the safe harbor's third criterion and ERISA shall provide the governing framework.

## IV. Dr. McCann's Claim for Total Disability

We now turn to the substance of Dr. McCann's claim for Total Disability. While ERISA governs Dr. McCann's supplemental coverage, both parties agree that Provident's decision to terminate Dr. McCann's benefits must be reviewed *de novo*. Where a plan administrator is vested with the discretionary authority to construe the terms of a plan or determine benefit eligibility, we review its decisions under an arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989). But where, as here, such discretionary authority is lacking, our review is plenary. *Id.*

In exercising this plenary review, our role "is to determine whether the administrator . . . made a correct decision." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)). Our review is not colored by a presumption of correctness and we determine whether the insured was entitled to benefits under the plain terms of their policy. *Id.* at 414. As noted, Dr. McCann's policy defines "Total Disability" as being unable to perform "the substantial and material duties of your occupation." Joint App. at 308. Dr. McCann's claim for disability benefits accordingly raises three questions: What was Dr. McCann's "occupation" at the time he became disabled? What were the "substantial and material duties" of that occupation? And do Dr. McCann's

34

medical conditions prevent him from performing those duties? We address these questions in turn.

## A. Defining Dr. McCann's Occupation

Beginning with the question of Dr. McCann's occupation, the relevant policy language states:

> [Y]our occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

Joint App. at 308.

In terminating Dr. McCann's benefits, Provident explained its initial payments were based on an incorrect understanding of Dr. McCann's occupation and that while "Dr. McCann was hired by and listed by Holzer Clinic as an Interventional Radiologist, his CPT codes clearly reflect[ed] that, in the years prior to disability, Dr. McCann was practicing primarily as a Diagnostic Radiologist." Joint App. at 153. The District Court agreed with this analysis, *see McCann v. Unum Provident*, No. CV 11-3241 (MLC), 2016 WL 1161261, at *34 (D.N.J. Mar. 23, 2016), but Dr. McCann maintains the record undisputedly shows his "'recognized specialty' is interventional radiology, involving stressful, intrusive medical procedures and weekend and night call." Appellant's Br. at 48.

35

We therefore consider, in light of the policy's definition, whether Dr. McCann's occupation is interventional radiology or diagnostic radiology for purposes of evaluating his disability claim.

As an initial matter, we address Provident's contention that our decision in *Lasser v. Reliance Standard Life Insurance Company*, 344 F.3d 381 (3d Cir. 2003) should guide this analysis. There, we considered the meaning of "regular occupation" in an orthopedic surgeon's disability insurance policy and concluded "'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability." *Id.* at 386. But this statement was addressing the insurer's decision to interpret "regular occupation" based on a typical work setting for any employer in the general economy. *Id.* at 385. We held that "[b]oth the purpose of disability insurance and the modifier 'his/her' before 'regular occupation'" made clear the analysis had to be conducted based on the insured's own occupation. *Id.* at 386. No one disputes Dr. McCann's own occupation is the relevant scope of analysis. We are also mindful that *Lasser*, and other cases cited by the parties, turn on the policy language specific to those cases and are therefore of no application to Dr. McCann's specialty-specific policy.[19]

Turning to the policy language at issue here, we agree that particularly the first part of the definition—defining occupation as that "in which you are regularly engaged at the

---

[19] For example, *Lasser* discusses the meaning of "regular occupation" because the insured's policy classified a claimant as totally disabled when he was "[in]capable of performing the material duties of his/her regular occupation." 344 F.3d at 383.

time you become disabled"—supports a practical assessment of Dr. McCann's pre-disability activities, similar to that in *Lasser*. But importantly, this language precedes, and is therefore qualified by, the concept that "your occupation [can be] limited to a recognized specialty." Joint App. at 308. Because the record demonstrates diagnostic radiology was a component of Dr. McCann's responsibilities as an interventional radiologist, we conclude Provident's final determination regarding Dr. McCann's occupation was incorrect.

First, from a formalistic perspective, it is undisputed that Dr. McCann possesses the qualifications of an interventional radiologist. He is certified in that specialty.[20] Dr. McCann was also hired by Holzer Clinic as one of three interventional radiologists, and, in fact, would not have been hired but for his ability to perform some interventional work.

Functionally, it is also clear from Dr. Long's job description, detailing Dr. McCann's duties and responsibilities, that Dr. McCann performed at least some amount of interventional radiology, estimated at as much as 20 hours per week. The District Court focused its analysis on the fact that "the diagnostic duties associated with his occupation accounted for 91% of the procedures he performed each week during the three and a half year period preceding [Dr.

_____

[20] Specifically, Dr. McCann's Statement of Material Facts describes his education as the "completion of a surgical internship, four years of study as a diagnostic radiologist, and board-certification as a diagnostic radiologist, followed by a one-year interventional radiology fellowship program." Joint App. at 4053.

37

McCann's] application for disability leave." *McCann*, 2016 WL 1161261, at \*34 (internal quotations omitted). But we note that a purely mechanical comparison of the number of interventional procedures and diagnostic tasks fails to account for the time dedicated to each type of work. Dr. Long explained during Provident's field visit that in the same amount of time it can take to do an interventional procedure, *e.g.*, an angioplasty, he can probably read more than 10 MRIs.

Even accepting that diagnostic work accounted for the bulk of Dr. McCann's billing, the record makes clear that interventional radiologists perform diagnostic radiology. When asked whether Dr. McCann was hired as an interventional radiologist or a diagnostic radiologist, Dr. Long replied "[b]oth" and explained that interventional radiologists do both things. Joint App. at 3148. The first CPT review conducted by Provident produced a similar percentage ratio between interventional procedures and diagnostic readings, and these same percentages were used to support a conclusion that Dr. McCann performed duties related to "Diagnostic & Interventional Radiology prior to disability." Joint App. at 1514. We also note the American Board of Radiology recognizes a specialty in "Interventional Radiology and Diagnostic Radiology" distinct from a specialty in "Diagnostic Radiology." *See ABMS Guide to Medical Specialties* 66–67 (2018), https://www.abms.org/media/176512/abms-guide-to-medical-specialties-2018.pdf.

Thus, the interventional aspects of Dr. McCann's practice cannot be cast aside from the definition of his occupation merely by focusing exclusively on the number of "units" of work Dr. McCann billed. The policy explicitly cabins the definition of "occupation" to an insured's

38

recognized medical specialty, and, in fact, this was a primary selling point in Lucasse's marketing materials.[21] The letter

[21]Specifically, Lucasse's letter stated:

> [T]he definitions written in disability policies are of utmost importance, and may vary greatly. We want to assure you that Provident has achieved its position by providing the best possible definitions, and continually updating to the industry's highest standards . . . .

> The single greatest concern for a physician is the definition of disability. Unlike many occupations, a doctor may become disabled by an injury or illness that would not preclude working in another occupation. Your program will state that you are disabled if "you can not do the duties of your occupation" without regard to your ability to do any other. It further states that your occupation is a recognized medical specialty, with its own specific duties. *Thus, it is possible for you to be disabled within your specialty while you can still be a physician.*

> This explanation of benefits is offered to assure you that all of the

represented that "your occupation is a recognized medical specialty, *with its own specific duties*," and explains "it is possible for you to be disabled within your specialty while you can still be a physician." Joint App. at 168 (emphasis added). The record reflects Dr. McCann was performing at least some interventional procedures—procedures a diagnostic radiologist would not be able to perform. Accordingly, we hold Dr. McCann's occupation to be an interventional radiologist for purposes of assessing the merits of his claim.

## B. Dr. McCann's "Substantial and Material Duties"

We next turn to Dr. McCann's "substantial and material duties," having defined Dr. McCann's occupation as his specialty: interventional radiology. Provident again relies on our decision in *Lasser* to argue that materiality is necessarily derivative of the income earned from and the amount of time spent performing a duty. Once again, we decline to apply *Lasser* out-of-context to Dr. McCann's specialty-specific policy.

Furthermore, in *Lasser* we considered whether night call and emergency surgeries were "material" to an orthopedic surgeon's occupation. We concluded yes, finding the district court's reasoning supported by comparing the insured's pre-disability earnings with his post-disability earnings from a reduced schedule. *See* 344 F.3d at 387–88. But we also considered the materiality question in the abstract and

---

elements of planning have been addressed.

Joint App. at 166–168 (emphasis added).

40

concluded those duties were material based, in part, on a labor market survey the insurer had conducted. *Id.* Even if *Lasser* were helpful to our analysis, therefore, it in no way suggests an analysis of pre-and post-disability earnings is the only measure of materiality.

On the record before us, we think Dr. McCann's "substantial and material duties" are established and include both his ability to perform interventional procedures and his ability to do so on nights and weekends.[22] As noted, Dr. McCann "would not have been hired by Holzer Clinic if he did not perform some interventional radiology." Joint App. at 3148. Dr. Long also explained during Provident's field visit that diagnostic radiology was evenly divided among the practicing radiologists at Holzer and Dr. McCann's interventional responsibilities were "on top of" his "even share" of diagnostic duties. Joint App. at 3149. As one of three interventional radiologists, Dr. McCann was responsible for performing all interventional procedures every third week.

Regarding on-call work, Dr. Long confirmed that Holzer requires radiologists to perform on-call duty for weekends, holidays, and emergency cases and "has never hired a radiologist who has been unable to perform on-call work." Joint App. at 3152. When asked whether Holzer would consider hiring Dr. McCann again, Dr. Long stated that Holzer might, hypothetically, if he "could work as a diagnostic

---

[22] Indeed, Provident's counsel agreed at oral argument that working night shifts and weekends is a substantial and material duty of Dr. McCann's occupation. *See* Transcript of Oral Argument at 35, *McCann v. Unum Provident* (No. 16-2014) (3d Cir. April 26, 2018).

41

radiologist *who could also perform on-call work.*" Joint App. at 3151 (emphasis added).

Provident and the District Court place significant emphasis on Dr. McCann's CPT codes and the fact that over 82% to 90% of his income was generated from performing diagnostic radiology. Again, we note that Dr. McCann's CPT codes do not take into account that a single interventional procedure can take significantly longer to perform than a diagnostic procedure. And to the extent Dr. McCann's income was predominantly derived from his diagnostic work, dollar value of billings is only one measure of "substantial and material"—it does not eclipse all other aspects of Dr. McCann's occupation, particularly when Dr. McCann's policy defines his occupation as limited to his specialty. The record makes clear that diagnostic radiology is one component of an interventional radiologist's specialty, but not the only component. We will not define Dr. McCann's occupation and its "substantial and material duties" solely by counting up billing units.

### C. Dr. McCann's Ability to Perform his "Substantial and Material Duties"

One question remains: whether Dr. McCann's medical conditions prevented him from being able to perform the substantial and material duties of his specialty, either by rendering him physically unable or by so limiting his availability that he was precluded from continuing his practice as an interventional radiologist. On this question we find a dispute of material fact, which we remand for the District Court to consider.

The record demonstrates some level of consensus on this question. Dr. Davids concluded "the prognosis for functional improvement is poor because it is difficult to maintain [a] level of tight BP control while working in a stressful occupation, such as interventional radiology." Joint App. at 1455. Dr. Parisi concluded "[i]f [Dr. McCann] is an interventional radiologist it is reasonable that he would not be able to perform some of the interventional activities." Joint App. at 2043. Dr. Lambrew similarly concluded McCann could perform "[s]ustained, full time light work as a non-interventional Radiologist," Joint App. at 2619, and nurse practitioner Loring's notes suggest McCann "try to do just regular radiology," Joint App. at 2435.

But Dr. Sweeney's most recent report concluded "[t]here are no limitations on function supported" which "would prevent Dr. McCann from resuming on a full-time basis his previous occupation as an interventional and diagnostic radiologist." Joint App. at 3198-99. This raises enough of a factual issue to warrant remand.

## V. Dr. McCann's Claim for Residual Disability

We also remand for the District Court to consider Dr. McCann's claim for Residual Disability. The court found this argument untimely because the claim was filed after Provident's final determination and emphasized that to consider Residual Disability in the first instance would "thwart ERISA's underlying objective to promote the exhaustion of administrative remedies." *McCann*, 2016 WL 1161261, at *35. While the doctrine of exhaustion undoubtedly furthers numerous sound policies, we think Dr. McCann's failure to

exhaust the Residual Disability claim can be excused in this instance.

Exhaustion, in the ERISA context, is not a rule of jurisdiction. *See Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 279 (3d Cir. 2007). Rather, exhaustion is "a judicially-crafted doctrine" placing "no limits on a court's adjudicatory power." *Id.* While traditionally the exhaustion requirement is strictly enforced, we have recognized an exception where "resort to the administrative process would be futile." *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990); *see also Price*, 501 F.3d at 279 ("[T]he failure to exhaust will be excused in cases where a fact-sensitive balancing of factors reveals that exhaustion would be futile.").

The principle of futility lends itself to this case. Provident addressed Residual Disability in its December 2009 letter terminating benefits and in its September 2010 letter denying Dr. McCann's appeal. The 2009 letter states, for example: "Based on our review of you [sic] medical conditions we have determined that you are no longer Totally Disabled or Residually Disabled in accordance with the terms of your policy." Joint App. at 124. Provident also explained:

> Although you indicated that you previously worked 60 hours per week, your ability to work 50 hours per week would not be expected to cause a reduction of your monthly income of more than 20% as required by the terms of Residual Disability. As such, you

44

are not Residually Disabled in accordance with the policy terms.

Joint App. at 126. In the 2010 letter, Provident continues to say "it was determined [Dr. McCann] can perform the duties of his occupation, and therefore, was not Totally or Residually Disabled." Joint App. at 149. Based on this language, Dr. McCann could reasonably have been under the impression that Provident was considering both types of disability claims in its review or that raising a Residual Disability claim would be futile.

Regarding ERISA's underlying objectives, we have recognized that exhaustion helps to reduce frivolous lawsuits, promote consistent treatment of claims, and to minimize the costs of settlement. *See Prince*, 501 F.3d at 279. Exhaustion also "has the salutary effect of refining and defining the problem for final judicial resolution." *Id*. (internal quotation marks and citation omitted). These objectives are important, but Dr. McCann's claim for Residual Disability is based on a medical condition Provident has already considered and approved for Total Disability and, as such, the traditional purposes of exhaustion are less compelling here. Particularly in light of Provident's consideration of Residual Disability, both in its initial determination and in response to Dr. McCann's appeal, we conclude the doctrine should not be applied without regard to the particular facts of this case.

## VI. Conclusion

For the foregoing reasons, we will affirm the District Court's January 31, 2013 determination as to ERISA's

45

applicability but will vacate its March 23, 2016 grant of summary judgment for defendant-appellee and remand for further proceedings consistent with this opinion.